# Illinois Official Reports

## Appellate Court

---

### *In re Daniel G.*, 2021 IL App (1st) 210640

---

| | |
|---|---|
| Appellate Court Caption | *In re* DANIEL G., Minor-Appellee (The People of the State of Illinois, Petitioner-Appellee, v. Jesus A.-V., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>No. 1-21-0640 |
| Filed | November 12, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 21-JA-44; the Hon. Patrick T. Murphy, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Marvin Raidbard, of Skokie, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Gina DiVito, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Jean M. Agathen, of counsel), for other appellee. |

Panel       JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Martin concurred in the judgment and opinion.


**OPINION**

¶ 1        Daniel G. was placed in the temporary custody of the Illinois Department of Children and Family Services (DCFS) when he was three weeks old based on allegations that he was a neglected minor. The allegations stemmed from actions or omissions by Daniel's mother, Ms. G.[1] Based on stipulated testimony, Daniel was subsequently adjudged a neglected minor. Respondent Jesus A.-V. sought custody of Daniel after learning that he was Daniel's father. After a two-part dispositional hearing, the court made Daniel a ward of the court and found that both Ms. G. and respondent were unable to care for Daniel. DCFS was awarded custody and guardianship of Daniel.

¶ 2        Respondent does not contest the trial court's orders adjudging Daniel a neglected minor and making him a ward of the court. Respondent appeals from the trial court's finding that he was unable to care for Daniel and subsequent grant of custody and guardianship to DCFS. The State and Daniel's public guardian have filed appellees' briefs. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered below.

¶ 3        For the following reasons, we reverse the trial court's order and remand this matter for further proceedings consistent with our ruling.


¶ 4                                    I. BACKGROUND

¶ 5        On January 7, 2021, Daniel was born to Ms. G. Respondent is Daniel's father. Ms. G. has two other children: J.G., who was born October 12, 2015, and M.G., who was born August 21, 2018. Both J.G. and M.G. were adjudged wards of the court and placed with DCFS before Daniel's birth. Respondent is not the father of J.G. or M.G.

¶ 6        On January 21, 2021, the State filed a petition for adjudication of wardship, alleging that Daniel was a neglected minor whose environment was injurious to his welfare. The petition contained the following supporting facts:

               "Mother has four prior indicated reports for inadequate supervision, substance misuse, and substantial risk of physical injury/environment injurious to health and welfare by neglect. Mother has two other minors who are in DCFS custody with findings having been entered. Offered and recommended reunification services are outstanding. Mother tested positive for illegal substances in October of 2020 while pregnant with this minor. Mother has previously been diagnosed with depression and

_____

[1]The Office of the Public Defender, who was appointed to represent the mother, Ms. G., on appeal, has filed a motion in this court for leave to withdraw as counsel based on its conclusion that there are no meritorious issues to be raised. Counsel has filed a memorandum in support of the claim pursuant to *Anders v. California*, 386 U.S. 738 (1967). Ms. G.'s appeal is proceeding under case No. 1-21-0737 and will be addressed separately.

anxiety disorder. Mother states that there are two possible putative fathers for this minor. Paternity has not been established."

¶ 7    The petition for adjudication of wardship named two possible fathers: respondent, whose full name and address were provided, and "Antoine," whose last name and address was "unknown."

¶ 8    On January 21, 2021, the State also filed a motion for temporary custody and an affidavit documenting DCFS's efforts to date. Kevestiana Martin, the Division of Child Protection (DCP) worker, averred:

"This case was brought to DCFS['s] attention after [Ms. G.] gave birth to her child Daniel for allegation 60: Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect. Daniel tested positive for marijuana. [Ms. G.] admitted to using marijuana daily while pregnant. [Ms. G.] also admitted to suffering from Anxiety and Depression. [Ms. G.] has two children in care.

[Ms. G.] has a history of cocaine and marijuana use. It has been reported [Ms. G.] is non-compliant with services such as random drops, parenting classes, substance abuse classes, and on-going recovery treatment. Caseworker, Gerrie Avant expressed she doesn't think [Ms. G.] can parent Daniel. Investigator has been provided with documentation from Haymarket for substance abuse and parenting. [Ms. G.] has expressed she's willing to return to treatment with Daniel."

¶ 9    On January 26, 2021, the trial court held a temporary custody hearing. The parties stipulated to the facts alleged in the petition, and the trial court made a finding of probable cause and urgent and immediate necessity. The trial court further found that reasonable efforts could not prevent or eliminate the need to remove the minor from his home and awarded temporary custody to DCFS. The trial court entered an order for the release of Ms. G.'s medical records.

¶ 10    On February 9, 2021, the trial court entered an order for parentage testing for respondent and Daniel. The trial court also ordered publication for putative father "Antoine."

¶ 11    On March 16, 2021, the matter appeared in court for status. The court entered an order that stated "the adjudication and possible disposition and permanency hearings for this matter are set for April 14, 2021, at 1:00 p.m."

¶ 12    On April 6, 2021, a case management conference was held. DCFS caseworker Gerrie Avant, DCP worker Kevestiana Martin, and Ms. G. attended the conference. The trial court continued the case to April 14, 2021.

¶ 13    On April 14, 2021, based on the results of the DNA testing of respondent and Daniel, the court entered a finding of paternity. The petition for adjudication of wardship was amended to name respondent a party to the action and remove "Antoine" as a putative father.

¶ 14    The trial court then commenced an adjudicatory hearing. The court began by addressing respondent. The ensuing conversation established that respondent (1) was a lift maintenance technician who installed automotive lifts but was on unemployment for a little over a year due to the COVID-19 pandemic, (2) was 63 years old and a life-long Chicagoan, and (3) served in the military for six years. The trial court remarked that respondent "look[s] a lot younger than 63" and "look[s] like you're going to live forever."

¶ 15    The court also addressed Ms. G., who informed the court that (1) under the safety plan, Daniel was living with Ms. G.'s sister; (2) Ms. G. visited with Daniel regularly; (3) Ms. G.

finished parenting classes and was awaiting the start of therapy; and (4) Ms. G. was currently employed at Taco Bell.

¶ 16    The parties then stipulated to the following facts:

"1. [Daniel] is a male minor born on January 7, 2021.

2. On January 21, 2021, when Daniel's Petition for adjudication of Wardship ('Petition') was filed, Daniel could have been found *** in Chicago, Illinois.

3. [Ms. G.] is Daniel's mother. At all times relevant to the Petition, [Ms. G.] had legal care and custody of Daniel and resided *** in Chicago, Illinois.

4. [Respondent], Antoine Last Name Unknown and All Whom It May Concern are Daniel's putative fathers. People's Exhibit A, which is admissible into evidence, is a true copy of notarized paternity results for respondent and Daniel dated April 12, 2021. At all times relevant to the Petition, all of Daniel's putative fathers are non-custodial.

5. [Ms. G.] has four prior indicated reports: a) SCR 2271939A, Report Date November 2, 2016, Finding Date January 27, 2017, allegation 74 inadequate supervision as to [J.G.] date of birth October 12, 2015; b) SCR 2271939B, Report Date August 22, 2018, Finding Date December 18, 2018, allegation 65 substance misuse by neglect as to [M.G.] date of birth August 21, 2018 and; c) SCR 2271939C, Report Date May 29, 2019, Finding Date July 27, 2019, allegation 60 substantial risk of physical injury/environmental injurious to health and welfare by neglect as to [M.G.] and [J.G.]; and d) SCR 2271939D, Report Date August 28, 2019, Finding Date October 9, 2019 allegation substantial risk of physical injury/environment injurious to health and welfare by neglect as to [M.G.] and [J.G.].

6. [Ms. G.] has two other minors who are in DCFS custody with findings having been entered: a) [J.G.], 19 JA 720, adjudication order January 6, 2020, finding of neglect injurious environment, disposition order September 11, 2020, findings of wardship and guardianship to DCFS; and b) [M.G.], 19 JA 721 adjudication order January 6, 2020, finding of neglect injurious environment and neglect controlled substance, disposition order September 11, 2020, findings of wardship and guardianship to DCFS.

7. If called to testify, Kevestiana M. Martin would state that she is a DCP investigator employed by DCFS and in that capacity in January 2021 she received investigatory duties for Daniel and [Ms. G.], and that a) on January 8, 2021 at 1:52 p.m., at Comer Children's Hospital, [Ms. G.] said she takes Mirtazapine 15 mg and smokes marijuana twice daily, and that she used cocaine while pregnant with [M.G.], she went to Haymarket to complete services, got involved in DCFS intact family services but that she slipped up and started using drugs again, that she used marijuana daily while pregnant with Daniel but no other drugs; b) on January 21, 2021 at 11:44 a.m., over the telephone, [Ms. G.] said she relapsed with cocaine in April 2020, but has only used marijuana since, and that she buys her marijuana from dealers off the street and isn't sure if it was laced.

8. If called to testify, Gerrie Avant would state that she is a caseworker employed by DCFS, and in that capacity in May 2020 she became [Ms. G.'s] case manager for reunification with [M.G.] and [J.G.], but that she did not meet [Ms. G.] until October 2020, and that, prior to January 21, 2021, [Ms. G.] had not completed her reunification

services, [Ms. G.] had never completed random drops, [Ms. G.] had not been able to control [M.G.] and [J.G.] during visits, [Ms. G.] had refused to return to Haymarket for treatment when offered for her to go to treatment with Daniel, and that [Ms. G.] had not been consistent with visitation with [M.G.] and [J.G.], and while the foster parent was partly at fault, that issue resolved.

9. People's Exhibits 1 and 1A which are admissible into evidence, are, respectively, [Ms. G.'s] full and complete Comer Hospital medical records and a subset of People's Exhibit 1."

¶ 17 The trial court found:

"[B]ased on the stipulation, I will make the finding of neglect, environment injurious, anticipatory neglect. It's a close case, but I do find by a preponderance in light of the two kids that are in the system."

¶ 18 The trial court clarified that its finding of neglect was entered only against Ms. G. and not against respondent, the noncustodial parent. When the trial court then announced its intent to commence the dispositional hearing, respondent's attorney objected:

"MR. ROCHFORD: Well, the issue I have with that is it's my understanding that the case worker hasn't been in contact with my client. And so I am guessing he has not been assessed for services. His home has not been CERAP'd.[2] So we are not ready for dispo [*sic*] at this moment, and also I don't think he has even ha[d] a visitation order that I know of."

¶ 19 In response, the trial court indicated that it wanted to hear what visitation plans were currently in place so it would begin the dispositional hearing but would not make a final ruling until respondent was given an "opportunity."

¶ 20 In response to questioning by the court, Ms. Avant stated that DCFS received the paternity test results the previous day. Ms. Avant intended to "start setting up everything because we wasn't [*sic*] for sure if he was the father or not." Ms. Avant indicated that she did not have respondent's contact information.

¶ 21 Ms. Avant testified that DCFS placed Daniel in the custody of Ms. G.'s sister. M.G. and J.G. were placed with Ms. G.'s brother. Ms. G. visited Daniel at least two to three times a week. Ms. G. recently completed parenting classes and was on a waiting list for individualized therapy. Ms. G. completed her last substance abuse treatment around May 2020. Random drug testing of Ms. G. for the past three months did not reveal drug usage. Ms. Avant testified that Ms. G. was trying very hard to overcome her drug addiction and was doing everything required for her children to be returned to her home.

¶ 22 Ms. Avant, however, had not yet determined where Ms. G. was currently residing nor ensured that her home was safe for visits. Ms. Avant had also not yet conducted a background check on anyone who might be living with Ms. G. nor begun a CERAP for Ms. G.

¶ 23 Ms. Avant testified that respondent was disallowed from visiting Daniel until paternity was established. Given the results of the testing, Ms. Avant now intended to get respondent's contact information, begin visitations, and conduct a full assessment. Ms. Avant had never

---

[2]"CERAP" is the acronym for a "Child Endangerment Risk Assessment Protocol." *In re J.C.*, 2012 IL App (4th) 110861, ¶ 9; *In re Vicente G.*, 408 Ill. App. 3d 678, 679 (2011).

previously met respondent, had not run a background check on him, and knew nothing about his living situation.[3]

¶ 24    Ms. Avant testified that, after consulting with her supervisor, DCFS was recommending that Daniel be made a ward of the court and Janet Wukas Ahern be appointed guardian with the right to place.

¶ 25    The court again addressed respondent, who stated that he resided at Division Street and Kostner Avenue and was not impeded in any way from visiting Daniel. When the court asked, "And so do you have any interest in visiting your son in [*sic*] and everything—" respondent stated:

> "[RESPONDENT]: Yes, definitely. I have interest, and I want to visit him. I want him to be able to come and visit me. I want to be able to get him on the weekends or for a week.
>
> I have another son. He is going on three. He lives in Wisconsin. I travel out there like twice a month. I go, pick him up, bring him home with me for the weekend. Sometimes I keep him for a week."

¶ 26    The court then said:

> "THE COURT: Well, let's hope we can get there. The agency will have— obviously, I want you to contact the father here and work with him, and you have discretion for unsupervised visits with either parent. I trust your professionalism, and we will finish the dispo."

¶ 27    The dispositional hearing was continued until May 26, 2021. The court entered orders granting Ms. G. and respondent's motions for visitation subject to DCFS approval. The orders granting visitation required Ms. G. and respondent to observe multiple conditions, including: (1) ensuring appropriate supervision of Daniel; (2) cooperating and complying with all reasonable requests and referrals made by DCFS and its agents; (3) notifying DCFS of any change of address or change in living situation, including the addition of other persons into the household; (4) not using corporal punishment; (5) not using or possessing any illegal substances or paraphernalia; (6) refraining from using alcohol during visits; (7) providing samples for random drug screens as required; (8) notifying DCFS within 24 hours of any injury to the minor which would require professional medical treatment; and (9) arriving promptly to visits and providing a minimum of 24 hours' notice before canceling a visit.

¶ 28    On May 26, 2021, the dispositional hearing resumed. Ms. Avant was recalled to testify. Ms. Avant testified that she was assigned to be Daniel's caseworker in January 2021. Daniel resided with his maternal aunt in a placement that was deemed safe and appropriate. Daniel had no special needs. DCFS was working toward a return home to Ms. G. and was not working on concurrent planning.[4]

---

[3] During cross-examination of Ms. Avant, respondent's attorney confirmed that she now had respondent's contact information and would "reach out to him regarding visitation and assessment for services and CERAPing his home."

[4] DCFS is required to consider "concurrent planning" to assure the safe and adequate care of children who are taken away from their homes. 20 ILCS 505/5(a)(3)(F) (West 2020).

¶ 29    Ms. G. lived with her partner and her partner's mother. Ms. Avant had not performed a background check on either the partner or the partner's mother. Nor had Ms. Avant conducted a CERAP of Ms. G.

¶ 30    DCFS did perform an integrated assessment (IA) of Ms. G. Based on that assessment, DCFS determined that Ms. G. needed to continue performing random drug drops and participate in individualized therapy. Ms. G. did not need a parenting coach because she was very nurturing and able to care for her children. DCFS had granted Ms. G. unsupervised day visits with Daniel.

¶ 31    Ms. Avant then testified about her efforts concerning respondent. Two days before testifying, Ms. Avant completed her IA of respondent. Ms. Avant had no recommendations for reunifying respondent with Daniel because the agency was "still reviewing the IA, but from what we're reviewing, we don't think he would need many services."

¶ 32    Ms. Avant testified that respondent visited Daniel two to three times a week, and the visits went "pretty well." Ms. G.'s sister informed Ms. Avant of respondent's visits with Daniel. Respondent texted Ms. Avant the dates and times of his scheduled visits. Ms. Avant reported that Ms. G.'s sister characterized respondent as "nurturing."

¶ 33    Respondent was cooperative and was granted unsupervised contact with Daniel. Ms. Avant testified that those visits went "really well." DCFS was preparing for respondent to have an unsupervised visit with Daniel that coming weekend.

¶ 34    Respondent did what was necessary for the IA to be completed. Additionally, his CERAP was completed. Respondent, who lived alone, had a crib, had purchased a mattress for it, and had "everything set up." Ms. Avant testified, "[t]he home is very safe." Ms. Avant saw respondent interact with Daniel via Zoom and testified, "he interacts really well with him." Ms. Avant testified that in addition to Daniel, respondent had adult children and a young son.

¶ 35    On cross-examination, Ms. Avant reiterated that the CERAP established respondent's home was "safe" and that he was well-prepared for Daniel, having purchased multiple baby items, including diapers. Furthermore, DCFS verified that respondent had no prior criminal history or history of abusing or neglecting a child.

¶ 36    In response to being asked whether anything impeded DCFS completing the integrated assessment, Ms. Avant testified that her supervisor had to help her with it because she had never conducted one before. For this reason, Ms. Avant's assessment was conducted just two days before she testified. Ms. Avant testified that upon finalization of the assessment, DCFS "might" require respondent to perform random drops because he reported using drugs 10 years earlier. DCFS "might" also require parenting classes and individual therapy, but that this was just a "guess" because the integrated assessment was not yet completed, "[s]o it could be no services, or it can be some services."

¶ 37    Ms. Avant recommended that Janet Wukas Ahern be made permanent guardian of Daniel and given the right to place him. Ms. Avant's recommendation followed a "critical decision staffing" with her supervisor.

¶ 38    Respondent testified. He wanted Daniel placed in his custody "[b]ecause we're not getting the bonding time that we really need, and I just found out that he was my son. If I would have known, I would have been at the hospital to pick him up. He would have never been in this situation."

¶ 39        According to respondent, he had a "one-night stand" with Ms. G. Respondent knew Ms. G. before this occasion but only learned that she was pregnant and that he might be the baby's father eight months later. Respondent began visiting his son the day after the return of the results of the paternity testing. Respondent brought diapers, clothes, baby wipes, and a few other items for Daniel to Ms. G.'s sister.

¶ 40        Respondent had five grown children between 30 and 40 and a nearly 3-year-old son who resided with his mother in Wisconsin. Respondent had a co-parenting agreement with his son's mother. Respondent was never previously investigated by DCFS and denied using illicit drugs. Respondent was fully willing to cooperate with DCFS "[b]ecause I want my son. It's that simple." Respondent testified: "I want to bring my son home."

¶ 41        Ms. G. also testified. Ms. G. was a good mother who had made a "little minor mistake" and who wanted all of her children back in her care. Daniel was the first of her children to be taken from her as a baby. Ms. G. disagreed with respondent's characterization of their encounter as a "one-night stand" because the two had always been friends. Ms. G. "made a mistake that day" by having unprotected sex. While Ms. G. understood that respondent wanted Daniel and was "not saying he's not a good person," she opposed Daniel having overnight visits with respondent unless he took parenting classes. Ms. G. testified:

> "MS. G.: Just like I had to do the parenting thing over. So that's just my opinion about that. I'm cool with his dad. I do want my child myself. I want custody of all my kids, not just Daniel, just all my kids."

¶ 42        At the conclusion of the hearing, the trial court made the following oral finding:

> "THE COURT: We're done for now. I do find that it is in the best interest to make Dan a ward of the court and appoint Janet Ahern with the right to place, for all the reasons that are in the record.
>
> That means that both parents have the right to appeal me. It's the right to a free appeal. An appeal means you can go to a higher court. Human beings make mistakes. I'm a human being. I can make a mistake. You have 30 days to file a notice of appeal, which is a one-page document. Your lawyers will file it for you.
>
> You can talk to Ms. Rochford [*sic*] and Mr. Zumba concerning what that means. In the meantime, you've got to keep cooperating with the agency. You're both doing that. If you don't do it, you could lose custody of children.
>
> I'm going to give the agency authority for unsupervised visits with either parent at their discretion. I urge both parents to continue to visit the child. They both are. I think both parents are doing a good job."

¶ 43        The trial court granted Ms. G.'s request to defer setting a permanency hearing for J.G. and M.G. until DCFS determined a service plan. The trial court also gave Janet Ahern discretion to approve overnight visits and unsupervised between Daniel and Ms. G. and Daniel and respondent.

¶ 44        The written disposition order states that respondent "is unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor."

¶ 45        Respondent filed a timely notice of appeal on June 2, 2021.

II. ANALYSIS

¶ 47     On appeal, respondent challenges the trial court's order finding him unable to care for, protect, train, or discipline his son. Respondent does not challenge the orders adjudging Daniel a neglected minor and making him a ward of the court.

¶ 48     The State maintains that the court's dispositional order should be affirmed where the trial court's finding that respondent was unable to parent Daniel was not contrary to the manifest weight of the evidence and where DCFS was properly named guardian and custodian of him.[5] For the reasons that follow, we disagree.[6]

¶ 49                            A. Governing Principles of Law

¶ 50     Parents have a fundamental liberty interest in the care, custody, and control of their children. *In re M.H.*, 196 Ill. 2d 356, 362 (2001). As a matter of constitutional law, it is presumed that fit parents act in the best interests of their children. *Troxel v. Granville*, 530 U.S. 57, 68 (2000). " '[P]arents have an inherent right to the society and custody of their children which should not be abrogated except for the most compelling of reasons.' " *In re L.W.*, 2021 IL App (5th) 200311, ¶ 34 (quoting *In re Prough*, 61 Ill. App. 3d 227, 232 (1978)).

¶ 51     In any proceeding initiated under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)), the paramount concern is the best interests of the child. *In re N.B.*, 191 Ill. 2d 338, 343 (2000). Article II of the Act governs proceedings involving abused, neglected, or dependent minors. 705 ILCS 405/art. II (West 2020). The Act sets forth procedures that must be followed in determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *In re A.W.*, 231 Ill. 2d 241, 254 (2008). The procedure involves two steps. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing where the trial court determines whether the minor is abused or neglected. 705 ILCS 405/2-21 (West 2020); *In re L.W.*, 2021 IL App (5th) 200311, ¶ 23. When a minor is found to be abused, neglected, or dependent, the second step requires the trial court to hold a dispositional hearing under sections 2-21 and 2-22(1) of the Act (705 ILCS 405/2-21, 2-22(1) (West 2010)). *In re A.P.*, 2012 IL 113875, ¶ 21.

¶ 52     At the dispositional hearing, the court must first determine whether it is in the best interests of the minor and the public that the minor be made a ward of the court and, if so, the appropriate disposition for the minor. *Id.* The overriding concern in determining the appropriate disposition is the minor's best interest. *In re E.L.*, 353 Ill. App. 3d 894, 897 (2004).

¶ 53     At the time of the dispositional hearing in this case, the Act provided the trial court with four dispositional options. See 705 ILCS 405/2-23(1)(a) (West 2020).[7] The minor could be (1) continued in the care of his parent, guardian, or legal custodian; (2) placed in accordance with section 2-27 of the Act (*id.* § 2-27); (3) restored to the custody of the parent, guardian, or legal custodian, provided the court ordered that the custodian cooperate with DCFS and

---

     [5]The State's brief adopted the arguments made by the public guardian.

     [6]The notice of appeal was filed on June 3, 2021. This court's due date for filing this disposition was November 1, 2021. This case was orally argued on October 28, 2021. For good cause shown, it will be filed in excess of 150 days.

     [7]This version of the Act was effective from July 12, 2019, to August 19, 2021. See Pub. Act 101-79 (eff. July 12, 2019); Pub. Act 102-489 (eff. Aug. 20, 2021).

comply with the terms of an after-care plan or risk loss of custody and possible termination of parental rights; or (4) ordered partially or completely emancipated. *Id.* § 2-23(1)(a).

¶ 54　　A trial court's dispositional order will be reversed only if the factual findings at the dispositional hearing are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. *In re A.S.*, 2014 IL App (3d) 130163, ¶ 21; *In re Juan M.*, 2012 IL App (1st) 113096, ¶ 68. A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *People v. Peterson*, 2017 IL 120331, ¶ 39.

¶ 55　　　　　　　　B. Review of the Trial Court's Finding for Manifest Error

¶ 56　　In this case, DCFS was given custody and guardianship of Daniel based on the application of section 2-23(1)(a)(2). Under the express terms of the Act, such placement required compliance with section 2-27(1), which, in pertinent part, provides:

> "(1) If the court determines and puts in writing the factual basis supporting the determination of whether the parents, guardian, or legal custodian of a minor adjudged a ward of the court are unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian, the court may at this hearing and at any later point:
>
> * * *
>
> (d) *** commit the minor to the Department of Children and Family Services for care and service[.]" 705 ILCS 405/2-27(1) (West 2020).

¶ 57　　Our supreme court rejected the State's claim that a trial court could order a minor to the custody of DCFS without finding the parent unfit, unwilling, or unable to care for the minor in the case of *In re M.M.*, 2016 IL 119932, ¶ 31. The court held the Act's "one authorized disposition that does involve third-party placement" required the judicial entry of a statutory finding under section 2-27(1). *Id.* ¶ 24.

¶ 58　　Further, the burden of proof at a dispositional hearing is on the party requesting a finding that a parent is unable to care for, protect, train, or discipline a child. *In re L.W.*, 2021 IL App (5th) 200311, ¶ 33. The movant must establish the parent's inability by a preponderance of the evidence. *In re Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23. "Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." *In re K.G.*, 288 Ill. App. 3d 728, 735 (1997).

¶ 59　　Our review of the evidence presented at the dispositional hearing compels the conclusion that the trial court's written order finding respondent to be "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor" was manifestly erroneous.

¶ 60　　Immediately after Daniel was adjudged a neglected minor, the court commenced the dispositional hearing. Respondent's attorney indicated that he was "not ready" because he believed that the caseworker had not contacted his client or conducted an IA or a CERAP. Nor had respondent yet been given the opportunity to visit Daniel.

¶ 61    Counsel's expressed concerns would all be validated by Ms. Avant, who only learned the paternity testing results the previous day. Nevertheless, Ms. Avant informed the court that she was prepared on the first day of the dispositional hearing to recommend that DCFS be given custody and guardianship of Daniel.

¶ 62    The trial court indicated that it would not enter any findings until respondent was allowed an opportunity to assert his parental rights. As such, it commenced and continued the hearing to enable DCFS to conduct the necessary investigation. Respondent was ordered to cooperate, and cooperate he did, enabling Ms. Avant to successfully complete the CERAP and perform the IA.

¶ 63    Ms. Avant provided her findings to the trial court. She found respondent's "home is very safe" and that he had purchased all necessary items to care for Daniel. Based on her personal observations, respondent interacted well with Daniel. Ms. G.'s sister shared a similar opinion, informing Ms. Avant that respondent was "nurturing." DCFS conclusively determined that respondent had neither a criminal background nor any previous history of abusing or neglecting a child.

¶ 64    Respondent's testimony provided no basis for finding him unable to care for Daniel. Respondent testified that he wanted to bring Daniel home so that he could care for him. Respondent stated: "we're not getting the bonding time that we really need, and I just found out that he was my son. If I would have known, I would have been at the hospital to pick him up. He would have never been in this situation."

¶ 65    Respondent had other children, including a three-year-old son whom he co-parented with the child's mother. Respondent made frequent trips to Wisconsin to see his son, drove him to Chicago, and cared for him overnight. Respondent plainly indicated that he would cooperate with anything that DCFS required of him to gain custody of Daniel.

¶ 66    The State focuses on Ms. Avant's speculation about what future services DCFS might find necessary when they finalize their assessment. The State's reliance on Ms. Avant's speculation as to what services "might" be required, while admitting that her speculation was no more than a "guess," underscores the problem with these proceedings, namely, DCFS's failure to finalize the integrated assessment. That failure, by Ms. Avant's admission, meant that DCFS had *no* recommendations for reunifying respondent with Daniel, even though she testified that "from what we're reviewing, we don't think he would need many services."

¶ 67    Additionally, we do not find that respondent's self-admitted drug use 10 years earlier, standing alone, provides a basis for us to affirm the trial court's finding. In this regard, we note that any concern as to whether respondent was truthful in his assertion that he did not currently use drugs could have been easily resolved by DCFS asking him to provide a drug drop. Indeed, after the first day of the dispositional hearing, respondent agreed to comply with any reasonable requests and referrals that DCFS and its agents might make, *including random drug screens*. Based on the record before us, there is no indication that DCFS ever asked respondent to provide a sample.

¶ 68    The State's reliance on *In re M.W.*, 386 Ill. App. 3d 186 (2008), and *In re Chelsea H.*, 2016 IL App (1st) 150560, is misplaced where both cases are factually inapposite. In *M.W.*, the appellate court reversed the trial court's finding that custodial parent Lori B. was fit "where M.W. was neglected due to an injurious environment and Lori B. had not made sufficient progress in therapy and counseling to deal with the psychiatric disorder that had prevented her from protecting [M.W.'s half-sibling] D.J." *M.W.*, 386 Ill. App. 3d at 200. Lori B., who was

previously diagnosed with a dependent personality disorder with borderline features, was pregnant with M.W. when she surrendered her parental rights to D.J. *Id.* at 190.

¶ 69    In *Chelsea H.*, the trial court found the custodial parents' children neglected based on their actions that created an injurious environment. *Chelsea H.*, 2016 IL App (1st) 150560, ¶ 81. The respondents were ordered to engage in services in order to be reunified with their children. *Id.* ¶ 47. Where those services were not completed at the time of the dispositional hearing, the trial court properly concluded that it was in the children's best interests to remain wards of the court. *Id.* ¶ 87.

¶ 70    In stark contrast to *M.W.* and *Chelsea H.*, in this case, respondent was Daniel's non-custodial parent and bore no responsibility for Daniel being adjudged a ward of the court and a neglected minor. DCFS ordered no services for him and admitted that no services might be required when they eventually finished their assessment. We note that respondent did not bear the burden of proving that he was able to care for, protect, train, or discipline Daniel. *In re L.W.*, 2021 IL App (5th) 200311, ¶ 33. That burden sat squarely on the shoulders of the State. *Id.* If anything, the court's well-reasoned decision in *M.W.* demonstrates the paucity of the investigation that was conducted in this case.

¶ 71    The only individual who questioned respondent's ability to care for Daniel was Ms. G., whose actions caused Daniel to be adjudged a neglected minor and a ward of the court. Ms. G. testified that she made a "little minor mistake" and wanted all of her children restored to her custody. Ms. G. opposed Daniel having unsupervised overnight visits with respondent because she believed that he should be required to participate in parenting classes since he had not "raised" any of his other children. Ms. G. was also annoyed that respondent characterized their relationship as a "one-night stand" since they had been friends for a long time. Despite this, Ms. G. was "not saying he's not a good person" and was "cool" with respondent.

¶ 72    Ms. G.'s testimony did not support the trial court's order. Our conclusion finds support in *L.W.*, 2021 IL App (5th) 200311. In *L.W.*, the court found that the mother's objections to the grant of custody to non-custodial father provided an insufficient basis for the court to find the father unfit and order the minor placed in the custody and guardianship of DCFS. *Id.* ¶ 33.

¶ 73    In sum, in this case, the evidence did not support the trial court's finding that respondent was unable to care for Daniel.

¶ 74                                    III. CONCLUSION

¶ 75    We conclude that the trial court's ruling was against the manifest weight of the evidence and remand this matter for further proceedings consistent with this opinion.

¶ 76    Reversed and remanded.