NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260232-U

NOS. 4-26-0232, 4-26-0233 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 19, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* C.B, a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazwell County |
|      Petitioner-Appellee, | ) | No. 25JA86 |
|      v.    (No. 4-26-0232) | ) | |
| Brenna N., | ) | |
|      Respondent-Appellant). | ) | |
| | ) | |
| | ) | No. 25JA87 |
| *In re* A.B., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|      Petitioner-Appellee, | ) | |
|      v.    (No. 4-26-0233) | ) | Honorable |
| Brenna N., | ) | Katherine G. P. Legge, |
|      Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Steigmann and Justice Grischow concurred in the judgment.

**ORDER**

¶ 1     *Held*:   (1) Respondent's stipulation to the factual allegations in the petition for
adjudication of wardship established that the children were neglected minors.

    (2) The factual findings in the dispositional order are not against the manifest
weight of the evidence, nor are the dispositions therein an abuse of discretion.

¶ 2     After finding that five-year-old C.B. and seven-year-old A.B. were neglected

minors, the circuit court of Tazewell County made them wards of the court and awarded custody

of C.B. to his father, Cody B., and custody of A.B. to the guardianship administrator of the

Illinois Department of Children and Family Services (DCFS). Respondent, Brenna N., the

children's mother, appeals.

¶ 3        The attorney representing respondent on appeal moves for permission to withdraw from representing her, for he does not think it would be possible to make any reasonable argument in support of this appeal. He explains in a memorandum why he has arrived at this assessment. We notified respondent of her right to respond with additional points and authorities, but she has not done so.

¶ 4        In our review of the record and counsel's memorandum, we agree with counsel that this appeal is unarguable. Therefore, we grant his motion for permission to withdraw, and we affirm the circuit court's judgment.

¶ 5                                  I. BACKGROUND

¶ 6        On June 17, 2025, the State filed two petitions, one pertaining to C.B. and the other pertaining to A.B. According to these petitions, C.B. and A.B. were "neglected minors" within the meaning of section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2024)) in that their environment was injurious to their welfare. The facts the State alleged in support of that conclusion were the same in both petitions.

¶ 7        These alleged facts can be organized into two categories, the first of which is concerned with the uncleanliness of the children's living quarters. On March 26, 2025, according to the petitions, an investigator with DCFS, Brittanie Kelly, visited the family home on Jefferson Street in Washington, Illinois. During this visit, A.B. told her that "the family dog often has accidents in the home." C.B. likewise told Kelly that "the dog often pees and poops in the home."

¶ 8        The second category of alleged facts has to do with domestic violence. The perpetrator, allegedly, was C.B.'s father, Cody B., who lived with respondent and the children at

the Jefferson Street address. (A.B., unbeknownst to her, had a different biological father, Trenton B. She believed that Cody was her father.) On more than one occasion, Cody was accused of physical violence toward respondent.

¶ 9    For instance, on July 22, 2024, according to the petitions, a Washington police officer, Michael Brown, went to the Jefferson Street address to investigate a domestic battery that reportedly took place there several days prior. Respondent told Brown that, on July 19, 2024, Cody accused her of cheating on him. During the ensuing argument (respondent reported to Brown), Cody held a pistol to the side of her head and evidently pulled the trigger, for she heard the pistol click, and he warned her that if she reported him to the police, he would kill her. Respondent further told Brown that on July 21, 2024, she and Cody got into another argument, this time in the bathroom, and that Cody pushed her, causing her to fall onto the toilet and break the toilet seat. The altercation in the bathroom was so loud that a neighbor called the police. However, when a police officer named Foster (last name unknown) arrived, respondent told Foster that the dispute had been merely verbal. Another police officer, Ramadan Moore, followed up by interviewing Cody, and Cody denied pulling a gun on respondent or pushing her onto a toilet.

¶ 10    On March 26, 2025, a woman, apparently respondent, called 911, and she could be heard shouting, on the line, " '[G]et away from me!' " and " 'Get your hands off of me!' " She hung up, or the call was disconnected, and then she called back and reported that she was having problems with her boyfriend. A Washington police officer, Amanda Krohe, responded to the call by going to the Jefferson Street address. When Krohe arrived, respondent gave her the following account. Respondent was sleeping upstairs, but she went downstairs to avoid arguing with Cody. About an hour later, Cody pulled her by the feet out of the downstairs bed, punched

her in the back, and when she tried to call the police, smacked her phone out of her hand. Respondent then started up the stairs to make the 911 call, but Cody grabbed her by the legs and pulled her down the stairs. She showed Krohe a red mark where, according to respondent, Cody had punched her.

¶ 11 On March 27, 2025, Kelly spoke with the children. A.B. told Kelly that "her daddy [was] not nice to mommy" (to quote the petition) and that, before the police came, she saw "her daddy pull[ ] her mommy down the stairs." C.B. likewise told Kelly that "sometimes his dad is not nice to his mom."

¶ 12 On April 8, 2025, Kelly spoke with Cody, who remarked that respondent had "a history of being unfaithful." Nevertheless, he "denied dragging [her] up or down the stairs." Instead, according to Cody, respondent had told the children, falsely, that he had "pushed her down the stairs." Kelly "received information that Cody has a history of opiate abuse and is in the process of weening off suboxone."

¶ 13 On April 22, 2025, Kelly spoke with respondent, "who reported that the incident with Cody was a misunderstanding" and that "the charges weren't filed." Kelly asked respondent if Cody had "drug her up or down the stairs." Respondent answered that she had "thought he drug her, but he didn't."

¶ 14 Respondent and Cody had a history of obtaining orders of protection against one another and then changing their minds and moving that the orders be dismissed. The petitions listed the cases in which they had done so:

"i. Tazewell County Case Number 2021 OP 976, [respondent] alleged in part physical abuse and threats by [Cody]. [She] requested the order of protection be dismissed on January 5, 2022[,] and the order was dismissed.

ii. Tazewell County Case Number 2024 OP 485. Cody in part alleged [respondent] is struggling with chemical dependency and alleged [she] is not stable. Cody alleged [that respondent's] actions are affecting the minors. On July 1, 2024, Cody moved to dismiss the order of protection[,] and the order was dismissed.

iii. Tazewell County Case Number 2024 OP 557. [Respondent] alleged in part that [Cody] threw her over the toilet and broke it and hit her in the mouth. Pointed a loaded gun at her and threatened her life. On August 5, 2024, [she] moved to dismiss the order of protection and the order was dismissed.

iv. Tazewell County Case Number 2024 OP 755. Cody alleged in part that [respondent] has an Adderall addiction going on three years. Cody alleged [she] took the children to her boyfriend's house and that she is coaching the kids into lying to him[.] Cody alleged he is worried about the kid's [*sic*] safety and the kids have seen enough anger and sadness. On October 21, 2024, Cody moved to dismiss the order of protection, and the order was dismissed.

v. Tazewell County Case Number 2024 OP 757, [respondent] alleged in part physical abuse by Cody, and she alleges he's using heroin. On October 21, 2024, [she] moved to dismiss the order of protection[,] and the order was dismissed.

vi. Tazewell County [Case] Number 2024 OP 757, Cody alleged that [respondent] is abusing prescription pills and threatens to end her life[,] and he is worried for the kid's [*sic*] safety. On January 30, 2025, the order of protection was dismissed at Cody's request."

¶ 15          Those were the allegations of neglect in count I of the petitions to make the children wards of the court (which might imply that the petitions had multiple counts, but they had only one count). Cody did not answer the petitions but, instead, on August 12, 2025, consented to a default. On November 4, 2025, respondent filed an answer to the petitions. In her answer, she neither admitted nor denied the allegations in count I of the petitions but "stipulate[d] the allegations could be proven to the applicable standard of proof." After admonishing respondent on her stipulation and re-admonishing Cody on his consent to a default, the circuit court obtained a factual basis from the State. The attorneys representing respondent and Cody confirmed that the proffer in the factual basis was consistent with their review of discovery. The court then found that the stipulation and the consent to a default were "knowingly, voluntarily, [and] understandingly made" and that there was a factual basis for the stipulation. Consequently, the court found that "the children were in fact neglected by way of injurious environment."

¶ 16          The circuit court then held a dispositional hearing. The State called a caseworker, Nicole O'Connell, who testified that she had given respondent a ride to the hearing. Upon their arrival at the courthouse, when respondent took off her sunglasses and O'Connell saw the redness around her eyes, she thought that respondent was possibly under the influence of drugs—although, since the beginning of the case, O'Connell had been aware that a bacterial infection had made respondent blind in one eye. But "this [was] the first time" that O'Connell had "witnessed the redness around her eyes." O'Connell also noticed that respondent was going to the bathroom a lot: five times in about 1 hour and 20 minutes. At the courthouse, Cody had called O'Connell's attention to the appearance of respondent's eyes and had "mentioned" to O'Connell "that that's how [respondent] looks when she is high." When Cody was called to the

stand, he admitted having made the observation to O'Connell that respondent's eyes looked red when respondent was high. When asked in the stand, however, "[I]s that how she looks when she's high?" he answered that he did not know, although he noted that she had a history of abusing Adderall. When respondent took the stand, she denied that she was under the influence of drugs. She explained that the redness of her eyes was due to antibiotic eye drops that she had been prescribed and which she was supposed to take six to eight times a day.

¶ 17        On November 18, 2025, respondent tested positive for amphetamines, but on November 24, 2025, she testified negative for drugs. Subsequently, however, she failed to appear for six weekly drug screenings, on December 2, 10, 18, and 30, 2025, and on January 16 and 21, 2026 (although the record appears to lack any indication that the circuit court had ordered her to submit to drug screenings).

¶ 18        O'Connell was asked whether, prior to the dispositional hearing, she had ever noticed anything about respondent that caused O'Connell to be concerned about possible substance abuse. O'Connell recounted, "I believe there was one time that we spoke on the phone that I believe she was intoxicated, just the way she was talking to me." This phone conversation took place around noon, when the children were in school.

¶ 19        When O'Connell was on her way to the dispositional hearing, her impression was that respondent had been "doing great." Respondent had been "doing great in counseling," according to an update from the counselor, and the children had been doing "[g]reat" and had been "[d]oing well academically," too. Respondent had signed "a release of information" so that she could take a parenting course, which was scheduled to begin soon. There was, it was true, that positive drug test, but "people make mistakes and it doesn't mean that they're, you know, a bad parent." But the appearance that respondent had at the dispositional hearing of being under

the influence of drugs gave O'Connell pause. Until the day of the dispositional hearing, O'Connell would have characterized respondent as fit, but now she was unsure.

¶ 20 As for Cody, O'Connell regarded him as fit. Ever since Cody and respondent separated in October 2025, O'Connell had no concern about his ability to parent the children. Cody was signed up for counseling and for classes on parenting, domestic violence, and anger management, but those services were not yet available, which was to say that, through no fault of his own, they had not started up yet. He had divulged to O'Connell that he was accustomed to using marijuana in the evening, but O'Connell had no problem with that, considering that his use of marijuana was confined to the evening and he had never appeared to be under the influence of drugs. She had seen the children at Cody's home twice after the separation, and nothing seemed amiss. To O'Connell's knowledge, A.B. had not yet been made aware that Trenton B., rather than Cody, was her father.

¶ 21 At the conclusion of the dispositional hearing, after arguments, the circuit court found that Trenton B. was *fit* to take care of A.B. but that he was *unable* to do so because A.B. was of the understanding that Cody was her father. Therefore, the court wanted to "get [A.B.] established with a counselor because it's going to be awful confusing when she realizes she's got a bonus dad."

¶ 22 The circuit court had "significant concerns as to [respondent's] sobriety." The court had been presiding over the case since June 2024, and respondent, with the "dark circles around her eyes," "looked markedly different today than" she had looked in prior hearings, and if "she had the kids in her care, [the court] would be very worried." The court continued:

> "I'm not really finding a whole lot of credibility in the eye drop situation because I was aware that she had the eye issue, but she's been in court since then

and didn't appear like she appears here today. But it's not just that. It's coupled with the positive methamphetamine drop. I realize she took—she did one test after that that was negative and then has failed to do any—I think there were five, if not more, missed drops since then. Six. Six missed drops since then, which leads me to have suspicions about her usage. And then also the call that Ms. O'Connell took from her in the November timeframe where [respondent] seemed intoxicated and the kids were at school. And—and otherwise, you know, in her care, went splendid. You put this picture together and I think [respondent] is struggling a bit right now.

    \*\*\* I think it's put [Cody] in a kind of a tough spot because he's—he sees it. He alerted the caseworker, but he doesn't want to be in the middle of it because they're trying to co-parent, but I have—I can tell you I would not want her to drive a car away from the courthouse with kids in it, I can tell you that much right now. Absolutely not."

¶ 23 Therefore, the circuit court found Cody to be fit and able to parent the children but respondent to be unfit to do so. The court ordered that Cody would be the guardian and custodian of C.B. and that DCFS would be the guardian and custodian of A.B. The court made both children wards of the court.

¶ 24 Trenton B., the circuit court reiterated, remained unable (though fit) because there was "no relationship" between him and A.B. As long as Trenton B. "stay[ed] in the case," however, and "continue[d] to want to exert his parental rights" he would receive visitation with A.B. "to establish that bond." Visitation between respondent and the children, the court ordered, would "need to be supervised."

¶ 25　　　　Trenton B.'s attorney requested that A.B. be placed immediately with Trenton B. since he was, after all, "her biological father"; he had no criminal record; there was not even a police report reflecting badly on him; no evidence had been adduced against him; and he had a good home, in which A.B. would be safe and provided for. The circuit court responded:

> "I'm going to deny that request because if I understand it, [Trenton B.], although related by DNA, is a stranger to the child, so that would be extremely traumatic to the child to just pull her from who she thinks her parents are, you know, [respondent and Cody], and put her with a stranger, albeit probably a very suitable stranger in the sense that it—I agree with those—you know—those classifications of [Trenton B.] as being, you know, fit, and suitable, an having a home that is—is fine. But I'm not going to do that to [A.B.] without going about it in an appropriate, therapeutic way.
>
> 　　　***
>
> 　　　*** And so she's going to meet him at some point. They're going to start *** a relationship and in the future maybe she will be placed there. I don't know. But I'm not—not comfortable doing that here today."

¶ 26　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 27　　　　　　　　A. The Finding That the Children Were Neglected Minors

¶ 28　　　　Before scrutinizing the circuit court's finding of neglect, to determine whether counsel could reasonably make an argument against the finding, we will explain the procedural context of the finding.

¶ 29　　　　Under the Act, there is a two-step procedure for determining whether a minor should be made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the

adjudicatory hearing (*id.* ¶ 19), at which the circuit court is to determine whether the minor is abused, neglected, or dependent as alleged in the petition for adjudication of wardship (see 705 ILCS 405/2-18(1) (West 2024)). One of the statutory definitions of a neglected minor—the definition the petitions invoked in this case—is a minor whose environment is injurious to his or her welfare. See *id.* § 2-3(1)(b).

¶ 30 If, at the adjudicatory hearing, the alleged neglect, abuse, or dependency is proven by a preponderance of the evidence (*A.P.*, 2012 IL 113875, ¶ 19), the proceedings then advance to the second step, the dispositional hearing. At the dispositional hearing, the circuit court decides (1) whether it would be consistent with the health, safety, and best interests of the minor and the public to make the minor a ward of the court and, if the answer to that question is yes, (2) what disposition would be in the minor's best interests (*id.* ¶ 21; *In re Daniel G.*, 2021 IL App (1st) 210640, ¶ 52; 705 ILCS 405/2-21(2) (West 2024)). "With reference to minors, a ward is an infant placed by authority of law under the care of a guardian, and such an infant is a ward of the court appointing the guardian." (Internal quotation marks omitted.) *In re Jennings*, 68 Ill. 2d 125, 133 (1977). A minor adjudged a ward of the court becomes "subject to the dispositional powers of the court under [the] Act." 705 ILCS 405/1-3(16) (West 2024).

¶ 31 "In all dispositional hearings, [t]he best interests of the child [are] the paramount consideration to which no other takes precedence." (Internal quotation marks omitted.) *In re Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23. Whenever the circuit court is required to determine the best interests of a minor—as, for instance, at a dispositional hearing pursuant to the Act— "the following factors shall be considered in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized guardianship or through adoption." 705 ILCS 405/1-3(4.05)(a)-(j) (West 2024).

¶ 32  A minor whom the circuit court has found to be neglected, abused, or dependent may be, as the best interests of the minor dictate,

"(1) continued in the custody of the minor's parents, guardian or legal custodian; (2) placed in accordance with Section 2-27 [(*id.* § 2-27)]; (3) restored to the custody of the parent, parents, guardian, or legal custodian, provided the court shall order the parent, parents, guardian, or legal custodian to cooperate with [DCFS] and comply with the terms of an after-care plan or risk the loss of custody of the child and the possible termination of their parental rights; or (4) ordered partially or completely emancipated in accordance with the provisions of the Emancipation of Minors Act [(750 ILCS 30/1 *et seq.* (West 2024))]." 705 ILCS 405/2-23(1)(a) (West 2024).

¶ 33  We will reverse a dispositional order only if either "the factual findings at the dispositional hearing are against the manifest weight of the evidence" or the circuit court "abused its discretion by selecting an inappropriate dispositional order." *Daniel G.*, 2021 IL App (1st) 210640, ¶ 54. A factual finding is against the manifest weight of the evidence only if it is "clearly evident" that the evidence required a contrary finding or only if "the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id.* Regardless of which of these two standards of review we apply, our mere agreement or disagreement with the circuit court's decision is not the question. To be an abuse of discretion, it is not enough that the reviewing court disagrees with the decision (if indeed it disagrees). Rather, the decision must be

"clearly against logic." (Internal quotation marks omitted.) *Vincit v. Vits*, 208 Ill. App. 3d 1, 5 (1991). An abuse of discretion occurs when the circuit court "acted arbitrarily, without employing conscientious judgment," or "exceeded the bounds of reason and ignored recognized principles of law," inflicting "substantial prejudice" on the respondent. (Internal quotation marks omitted.) *Id.*

¶ 34 Those standards of review are deferential, and the abuse of discretion standard of review is highly deferential. Because the finding of neglect, however (as distinct from the dispositional order), was based solely on documentary evidence—*i.e.*, the petitions, together with the signed stipulation—rather than on testimony that the trier of fact observed the witnesses giving, we do not regard the finding of neglect deferentially. Instead, we review it *de novo*. See *Cleeton v. SIU Healthcare, Inc.*, 2023 IL 128651, ¶ 26; *Fitzpatrick v. Human Rights Comm'n*, 267 Ill. App. 3d 386, 392 (1994); *Landmark Trust Co. v. Aitken*, 224 Ill. App. 3d 843, 847 (1992). We decide independently, then, whether C.B. and A.B. were neglected minors by reason that their environment was injurious to their welfare—or whether counsel could contest that finding without frivolity. See 705 ILCS 405/2-3(1)(b) (West 2024).

¶ 35 It is not hard to find previous decisions in which determinations of child neglect were upheld because of domestic violence between the parents. See, *e.g.*, *In re M.D.*, 2021 IL App (1st) 210595, ¶ 28; *In re T.S-P.*, 362 Ill. App. 3d 243, 249 (2005). "The term 'injurious environment' is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe nurturing shelter for her children." *M.D.*, 2021 IL App (1st) 210595, ¶ 24. A home in which one parent physically assaults the other is not a safe, nurturing shelter for children. It could not be seriously disputed that Cody committed acts of violence against respondent, sometimes in the presence of one or

- 14 -

both of the children. The finding of neglect could not be reasonably challenged. Thus, we conclude, *de novo* (see *Cleeton*, 2023 IL 128651, ¶ 26), that C.B. and A.B. were neglected minors in that their environment was injurious to their welfare, not only because of the dog urine and feces in the house, but because of domestic violence (see 705 ILCS 405/2-3(1)(b) (West 2024)).

¶ 36                                B. The Dispositional Order

¶ 37        In determining what disposition would be in the child's best interests, the circuit court is supposed to consider, among other factors, "the physical safety and welfare of the child." 705 ILCS 405/1-3(4.05)(a) (West 2024). Although isolated incidents of substance abuse do not necessarily endanger a child, "an ongoing pattern of substance abuse can create an injurious environment." (Emphasis and internal quotation marks omitted.) *In re K.F.*, 2023 IL App (1st) 220816, ¶ 68. If we were writing on a blank slate, so to speak, and the question were whether it had been proven by a preponderance of the evidence that respondent was still in a pattern of drug abuse, a reasonable argument could be made that it had not been proven. The redness or dark circles around her eyes that O'Connell, Cody, and the court noted at the dispositional hearing was merely a bacterial infection, it might be argued, or the reaction of her eyes to the eye drops. And although respondent tested positive for amphetamines on November 18, 2025, the argument might be made that whether she ever used amphetamines again—whether there was an ongoing pattern of drug abuse—was simply unknown and unproven. Other than the drug screening on November 24, 2025, which was negative, she never attended another drug screening, nor was she required to do so. And so we just do not know, it might be argued.

¶ 38        Those arguments would have been perfectly good arguments to make in the circuit court at the dispositional hearing. As counsel recognizes, however, they would be less

suitable arguments to make in the appellate court, for, unlike the slate the circuit court wrote on, ours is not blank. We do not approach the dispositional issue *de novo*. Rather, our standard of review on that issue is deferential. See *Daniel G.*, 2021 IL App (1st) 210640, ¶ 54.

¶ 39        Whether respondent was proven to be under the influence of an illegal substance at the dispositional hearing could be questioned. An innocent explanation for her appearance (the eye disease, the eye drops) could be postulated. But being able to raise a question is, at this point, not enough. It could not be plausibly asserted that the circuit court was *clearly* mistaken in its inference that respondent was under the influence of drugs at the dispositional hearing and that she, therefore, was still in a pattern of drug abuse. The court had defensible reasons for so inferring. From the start of the case, respondent had the eye disease, but in the circuit court's experience, she had never before looked the way she looked at the dispositional hearing. Cody had lived with respondent, and in his experience, her eyes looked that way whenever she was under the influence of drugs. O'Connell thought that respondent looked as if she were on drugs. Our deferential standard of review would require us to accept the court's conclusions that respondent was still struggling with drug addiction and that, judging by her appearance and demeanor of being under the influence, it would have been unwise to allow her to have custody of the children.

¶ 40        Given the conclusion that putting the children, at this time, in her custody would be contrary to their best interests, we do not know that respondent would object to placing C.B. in Cody's custody or that she would want to insist that A.B. be placed in the custody of Trenton B., who, though her biological father, was as yet a stranger to her. Counsel is, after all, respondent's attorney, and we cannot expect him to make dispositional arguments on her behalf that she would not necessarily approve.

¶ 41                                 III. CONCLUSION

¶ 42            For the reasons stated, we grant appellate counsel's motion to withdraw, and we affirm the circuit court's judgment.

¶ 43            Affirmed.