2024 IL App (1st) 232041

No. 1-23-2041

Opinion filed September 4, 2024

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* J.T., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19 JA 828 |
| | ) | |
| Donnell T., | ) | Honorable |
| | ) | Shannon O'Malley, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Reyes and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    Following an adjudication hearing and motion to reconsider, the trial court found that the minor child, J.T., was neglected due to inadequate shelter. The case proceeded to a disposition hearing where the court adjudged J.T. a ward of the court and found that respondent Donnell T., the father of J.T., was unable to care for him.

¶ 2     On appeal,[1] respondent argues that the trial court's findings that J.T. was neglected and respondent was unable to care for him were against the manifest weight of the evidence. J.T.'s mother is not a party to this appeal.

¶ 3     For the reasons that follow, we affirm the judgment of the circuit court.[2]

¶ 4                              I. BACKGROUND

¶ 5     J.T. was born in September 2012, and respondent is his father. In August 2019, the State filed a petition for adjudication of wardship, alleging that J.T. was abused or neglected, as well as a motion for temporary custody. Specifically, the petition alleged:

> "Minor has resided with father since 2016. In April of 2019, father and this minor were located sleeping in a hospital lobby. At that time father had been kicked out of a shelter and was on a thirty day hold from re-entering. Father placed this minor in Safe Families[3] in April of 2019 and failed to follow-up with obtaining adequate shelter for him and the minor. Father has refused services. Mother states she resides out of state but

---

[1]This appeal is subject to expedited procedures under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), and the original due date for this court's decision was April 1, 2024. However, due to technical difficulties concerning processing the record by the circuit and appellate court clerks' offices, the record in this matter was not processed until March 20, 2024. Consequently, the deadlines for the parties to file their briefs with this court were extended, and the actual date this case became ready for this court to consider the merits of this appeal was July 23, 2024.

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[3]Safe Families is a short-term crisis program where host families take custody of children. Safe Families began in Chicago in 2003 with the goal to encourage families to open their homes to vulnerable children. Parents experiencing a crisis voluntarily place their children with a volunteer host family for a limited time (usually six weeks), and the parents can opt to reunify with the children at any time. The Department of Children and Family Services is the largest referral source. See Safe Families for Children, Greater Chicago Chapter, https://chicago.safe-families.org (last visited Aug. 26, 2024); Safe Families for Children, *How Safe Families Works*, https://safe-families.org/about/how-safe-families-works (last visited Aug. 26, 2024) [https://perma.cc/GN73-TDEF].

refuses to disclose her whereabouts. Mother states she is unable to care for the minor. Parents' whereabouts are unknown."

¶ 6 The trial court initially entered a temporary custody order and continued the case for presentation of diligent efforts to notify respondent, who was not notified and not present. On the next court date, the court ordered that temporary custody was "taken with prejudice as to all parties." (The court's order suggests that this was respondent's first appearance.) At subsequent hearings, the court entered a finding of paternity for respondent based on a DNA test. The mother was found in default for failure to appear after notice by certified mailing. The court entered a case management conference order.

¶ 7 After several continuances, respondent filed a motion to dismiss under section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2018)), generally alleging that the petition should be dismissed because it "allege[d] solely economic reasons, which may not be the sole basis for wardship." The court ordered a combined hearing on the motion to dismiss and adjudication.

¶ 8 At the adjudication hearing on February 7, 2023, Department of Children and Family Services (DCFS) child protection investigator Kymethia Madkins testified that she was assigned to investigate an A-sequence[4] hotline report for inadequate shelter in April 2019, which alleged that respondent and J.T. were sleeping in the lobby of a hospital. There were no other allegations connected with this report. By the time Madkins was assigned, a "mandated worker" had seen J.T., and respondent had agreed to a Safe Families placement. Madkins explained that Safe Families is

---

[4]An A-sequence investigation is the first investigation that DCFS conducts into any family. Any subsequent investigations are designated with the next letter in the alphabet.

a "temporary" placement program meant to be used while "the parent gets whatever squared away, and we can place the child back with the parent" and keep the family intact.

¶ 9    Following her assignment to this case, Madkins met with respondent on April 30, 2019. During this meeting, Madkins asked respondent about the hotline call, and he stated that he was living with the mother of one of his other children, who kicked him and J.T. out. Respondent then went to a shelter but was kicked out for having an altercation with another resident. Respondent had been employed but quit. Because Safe Families is a temporary program, Madkins asked respondent about his plan for J.T. DCFS would typically attempt to place children with relatives, but respondent said he had none. Madkins offered respondent resources for seeking employment or finding a shelter, and DCFS provided him with a seven-day bus pass so he could have transportation for seeking a job. Respondent said that there was a 30-day hold on the shelter and he could return on May 17, 2019. Although respondent's ability to visit J.T. in the Safe Families program was restricted, respondent did visit J.T. through the host family when respondent was allowed. Madkins told respondent that she would follow up on his progress for making a plan for J.T. and finding a job.

¶ 10    Madkins called respondent on May 22, 2019, to follow up on his employment, shelter, and getting J.T. out of the temporary Safe Families placement. Respondent reported that he was living with a friend but there was not enough room for J.T. to safely reside there. Respondent also reported that he found work through an agency, and they discussed the need for childcare during the times he was working. Respondent needed a copy of J.T.'s birth certificate and medical card to extend the Safe Families placement. At the end of the call, Madkins indicated that respondent

still needed to "find placement for his child—make arrangements for the baby-sitting of his child and the birth certificate."

¶ 11    On May 31, 2019, Madkins spoke with respondent, who again reported that he was living with a friend and he would contact Safe Families to see if he could "get J.T. back to get into a shelter." Respondent still did not have a copy of the birth certificate, so he could not get insurance for J.T. Respondent stated that he was present when J.T. was born but was not named as J.T.'s father on the birth certificate. Respondent also reported that the mother had sent him a birth certificate at some point but he lost it while in the shelter. He had been unable to contact the mother recently because her phone was off. He was working with a father's rights group and was attempting to take a DNA test to get the birth certificate. Respondent was also exploring placement with the father of J.T.'s sibling. Madkins again discussed with respondent that Safe Families was a temporary program.

¶ 12    Meanwhile, Madkins monitored J.T.'s well-being through a contact at Safe Families. On June 20, 2019, Madkins learned from the Safe Families contact that respondent wanted J.T. to be placed in a short-term guardianship with the Safe Families host. Madkins explained in her testimony that a short-term guardianship arrangement would require the agreement of both parents but, up to this point, she had no contact with the mother. Later that day, Madkins contacted respondent, confirmed that he wanted to participate in a guardianship program, and explained that the mother would have to agree to it. Respondent said he would try to reach out to the mother.

¶ 13    On June 25, 2019, after consulting with her supervisor, Madkins extended the investigation so that she could explore connecting the parents to the extended families program, which offers short-term guardianship.

¶ 14    Madkins next called respondent on July 17, 2019. Respondent reported that he still could not obtain J.T.'s birth certificate. Respondent said he would explore other placement options for J.T. Madkins explained to respondent that the investigation had been open for about 90 days and he needed to obtain the documents or find a family placement.

¶ 15    On July 24, 2019, Madkins consulted with her supervisor and made a critical decision to take protective custody because, although respondent wanted J.T. to remain with the Safe Families placement, respondent still could not obtain the necessary documents to keep J.T. with Safe Families or participate in the extended families program and respondent failed to create any alternative care plan. Madkins attempted to "screen" the case into court the following day, but the state's attorney did not accept the case and asked Madkins to locate the mother.

¶ 16    Madkins consulted with her supervisor to extend the investigation, performed a diligent search for the mother, obtained addresses, and mailed her contact information to those addresses. On July 28, 2019, Madkins met with J.T., who reported that he had been living with respondent for the past four years, his mother lived in Delaware, and he had not spoken with her in a long time. Two days later, the mother called Madkins and reported that she had sent J.T. to live with respondent in 2016, she was living in a shelter, she could not come back to Chicago to care for J.T. because she had just started working, and she did not want to be involved in the case.

¶ 17    After Madkins's conversation with the mother, the State agreed to screen the case into court. Madkins explained that the basis for asking the State to file a petition for adjudication of wardship due to lack of care was because respondent still had not made a plan for J.T.'s living arrangements, respondent was still unable to obtain J.T.'s birth certificate, and the mother stated that she was unable to care for J.T.

¶ 18    The parties stipulated that the mother was noncustodial at all relevant times. With this evidence, all parties rested.

¶ 19    During argument on both the motion to dismiss and adjudication, respondent asked the court to dismiss the petition because the case "really comes down to a poverty issue and a lack of housing on behalf of [respondent]." Respondent argued that the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)) provides that economic hardship should be considered when deciding whether a minor had been neglected and that a parent cannot be found unfit for financial circumstances alone.

¶ 20    The State asked the court to find that J.T. was neglected due to both the lack of necessary care and an injurious environment based on Madkins's testimony that the mother could not care for J.T. and respondent failing to find adequate shelter for J.T. despite receiving referrals from DCFS. The State also argued against respondent's motion to dismiss, noting that the sections of the Act he cited did not refer to the provisions under which the State alleged J.T. was neglected. The Office of the Cook County Public Guardian agreed that respondent's motion to dismiss should be denied, argued that it was untimely because respondent could have raised it earlier or that dismissal was not the appropriate remedy where the petition could be amended, and asked for a finding of neglect due to lack of necessary care.

¶ 21    Respondent replied that his motion to dismiss was timely, the petition was never amended, and the evidence established only a lack of housing, which is insufficient to constitute neglect. The State argued in rebuttal that the petition was not based on poverty alone, noting that respondent was offered intact family services, he could have returned to the shelter with J.T. but there was no

evidence that respondent did, and Madkins extended the investigation to give him more time to obtain J.T.'s vital documents to pursue other placement options, but respondent did not do so.

¶ 22    Following argument, the court found as follows:

> "All right. Then right now, based upon a preponderance of the evidence, finding the testimony of the [Division of Child Protection] worker to be credible. This is all based upon a preponderance of the evidence.

> Poverty doesn't equal neglect. The single father. He had just lost his job. I don't find [neglect due to lack of necessary care] or [neglect due to an injurious environment]. Case dismissed. Mother was noncustodial."

¶ 23    Respondent asked the court to clarify whether it had ruled on his motion to dismiss, and the court clarified that the case was dismissed based on "the trial." The public guardian immediately asked for a stay of the court's order dismissing the petition for adjudication of wardship, noting that J.T. barely had contact with respondent while this case was pending and arguing that dismissing the petition would result in "returning [J.T.] today to some unknown location." The public guardian also asked the court to consider J.T.'s "best interests" and to reconsider its adjudication findings because respondent's argument in his motion to dismiss was incorrect. The court ultimately stayed the dismissal of the petition and set a schedule for a motion to reconsider.

¶ 24    In April 2023, the public guardian filed a written motion to reconsider, alleging that the evidence supported a finding of neglect and was not based solely on the family's poverty. Specifically, the public guardian argued that respondent could have returned to the shelter with J.T. but instead chose to "abandon" J.T. at the temporary Safe Families placement while

respondent lived with a friend, and respondent never complained that poverty prevented him from obtaining adequate shelter for J.T.

¶ 25    In his response, respondent alleged that the court's decision was not an abuse of discretion because he responded to the investigation by getting a new job and a temporary place for J.T. to stay and he "made several efforts" to comply with DCFS's requests. Furthermore, respondent argued that he was under no obligation to return to the shelter, "abandonment" was not raised at trial, and he did not abandon J.T. in any event because respondent approved the Safe Families placement. Respondent also argued that he made "numerous efforts" to obtain J.T.'s vital documents but no evidence indicated that DCFS helped him pay for it.

¶ 26    In May 2023, the State filed a memorandum of law in support of the motion to reconsider, contending that the State never alleged J.T. was neglected due to poverty and the court erred by focusing on whether respondent "was neglectful" instead of deciding whether J.T. was neglected.

¶ 27    On May 9, 2023, following argument consistent with the written motions, the court granted the motion to reconsider and found:

> "Based upon the preponderance of the evidence and after hearing the arguments I should have focused on the minor, not the father, that is based on preponderance of the evidence.
>
> The minor is left sleeping on the floor. Then later on the minor was dropped off at another shelter just kind of left there, deserted. He is only 8 years old. He was not receiving the necessary care that he should have. It was a hospital lobby. He was not getting adequate food, shelter and clothing.

[Neglect due to lack of necessary care] granted by preponderance of the evidence focus on the minor not the father."

The court entered a written order finding that J.T. was neglected based on not receiving adequate shelter and continued the case for disposition.

¶ 28 When the disposition hearing commenced on October 24, 2023, respondent was incarcerated at the Cook County Department of Corrections and was writ in for the hearing. The State admitted into evidence an integrated assessment, a group exhibit of family service plans, a group exhibit of court reports, a group exhibit of therapy reports for J.T., and a group exhibit including substance abuse treatment reports (referred to as JCAP and TASC) for respondent. According to the integrated assessment, respondent was recommended to participate in a substance abuse assessment and treatment, individual therapy, parenting education, family therapy with J.T., and random drug tests.

¶ 29 Tonajah Hooks testified that she was the assigned caseworker for this family and had been assigned since December 2022. Since then, she had only telephone contact with respondent about every other month. She had asked him to come to the agency to talk about recommended services, sign consent forms for the services, and visit with J.T., but respondent failed to do so. Hooks had last spoken with respondent on July 28, 2023, and while conducting a diligent search on August 17, 2023, learned that he was incarcerated.

¶ 30 Respondent had been assessed for services prior to Hooks's assignment. Respondent had initially participated in individual therapy but was discharged from that service due to his lack of attendance. Respondent was not engaged in any services at the time Hooks was assigned. Respondent refused to participate in random drug tests and made his whereabouts unknown. He

had an outstanding referral for parenting classes but had not gone to the agency to sign consent forms for that service. Hooks testified that respondent was not in need of any other services but was unsure if he ever received a referral for a housing advocate. The last time they spoke, respondent indicated that he was still unhoused and unemployed.

¶ 31   Prior to Hooks's assignment, visitation was deemed clinically inappropriate by the agency because J.T. would wet the bed after visits and felt uncomfortable with respondent. J.T. indicated that he wanted to have a relationship with respondent and would like supervised visits over Zoom. While the agency would support weekly Zoom visits, respondent did not confirm the visits in advance, so the Zoom visits did not take place.

¶ 32   Hooks testified that J.T. had recently turned 11 years old and was discharged from individual therapy a few months before the hearing but could see his therapist as needed if J.T. was triggered by something that happened at school or court. He did not need any other services. He lived in the same nonrelative placement since the start of the case in 2019. Hooks visited recently and found the placement to be safe and appropriate. She spoke with J.T. separate from the foster parents, and he reported no issues. There were no signs of abuse, neglect, or corporal punishment and no unusual incidents. J.T. was enrolled in school, where he was doing very well, and his medical records were current. He had no diagnoses or special needs. He had some anxiety about this case because his parents were not present. He indicated that he wanted to be adopted by the foster parents.

¶ 33   Following a meeting with her supervisor, Hooks recommended that J.T. be adjudged a ward of the court and recommended that a permanency goal of either substitute care pending a

court determination on termination of parental rights or returning home pending status would be in his best interests.

¶ 34    All parties rested. Following argument, the trial court found:

"Based upon preponderance of the evidence, considering what's in the best interest of [the minor], reasonable efforts [for] reconciliation have been made, appropriate services of family reunification [have] not been successful. At this time mother and father are unable.

October 2019 father was engaged in some services. He did a JCAP. He did—had a TASC coach then also nothing March 12th, '20. Fell off, nothing. Lost communication with the agency. He had to do substance abuse, random drops, individual therapy, parent/education, coaching, family therapy was recommended still appropriate. He didn't do it.

* * *

Father is incarcerated. The minor can have virtual visits if the minor is comfortable with the father. Father still has these services that are outstanding.

Minor right now is in a stable placement. He had individual therapy. He's pretty much done with it, but he feels—he feels triggered, different triggers, he can go back to individual therapy to speak with *** the therapist.

This case has been going on since 2019. This is old. Minor deserves permanency. So I'm placing the minor in the [guardianship] of [the DCFS guardianship administrator] with the right to consent to the minor's major medical and/or dental care.

To the father who's here, cooperate with DCFS, comply with the terms of any service plan, let's try to correct the conditions that required the child to be taken into care or you risk possible termination [of] parental rights.

Considering the physical—I'm considering the best interest of the minor, physical safety, welfare of the child, development of the child's identity, security, the child's wishes—the child's wishes. These things are taken into consideration."

¶ 35 The court entered a disposition order that found J.T. to be a ward of the court, that the mother and respondent were both unable to care for him, and that reasonable efforts had been made to eliminate the need for removal but were unsuccessful. The court terminated temporary custody and placed J.T. in the custody of the DCFS guardianship administrator. The court also entered a permanency order and set the goal at returning home pending a status hearing because the mother and respondent had not made substantial progress.

¶ 36 Respondent filed a timely notice of appeal.

¶ 37                                      II. ANALYSIS

¶ 38 As an initial matter, the State contends that respondent's "brief contains multiple instances of unnecessary, often speculative commentary—bordering on invective directed at the court system and DCFS—without citation to any portion of the record on appeal." The State asks this court to ignore any portions of respondent's brief that are not supported by the record. See *Keener v. City of Herrin*, 235 Ill. 2d 338, 346 (2009) (a party generally may not rely on matters outside the record to support its position on appeal, and a brief that fails to comply with this rule may be stricken, or the reviewing court may ignore the inappropriate material).

¶ 39    We grant the State's request and will ignore any portions of respondent's brief that are not supported by the record.

¶ 40                          A. Finding of Neglect Due to Inadequate Shelter

¶ 41    Respondent argues that the trial court erred when it found that J.T. was neglected due to respondent's poverty. Specifically, respondent argues that (1) the court erred in admitting hearsay testimony of the hotline call, which was the only evidence establishing that J.T. was without adequate shelter, (2) the allegation that J.T. spent one night in a hospital lobby was insufficient to establish that he was neglected due to inadequate shelter, (3) poverty is not a neglectful act and the court erred in failing to consider the family's circumstances, and (4) the court improperly stayed the adjudication finding by citing the best interests standard.

¶ 42    The Act establishes a process for deciding whether a child should be removed from his parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004); 705 ILCS 405/1-1 *et seq.* (West 2018). After a petition for wardship has been filed and the minor has been placed in temporary custody, the court must make a finding that the child is abused, neglected, or dependent at an adjudication hearing. 705 ILCS 405/2-21 (West 2018). The issue at adjudication is whether the child is neglected because adverse conditions exist, not whether a parent caused the neglect. *Arthur H.*, 212 Ill. 2d at 465-66. These cases are unique and must be decided on the basis of their circumstances. *Id.* at 463.

¶ 43    Neglect generally refers to the " ' "failure to exercise the care that circumstances justly demand," ' " but has a fluid meaning that includes both willful and unintentional disregard of parental duty. *Id.* (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). The State must prove neglect by a preponderance of the

evidence, meaning that the allegations are more probably true than not. *Id.* at 463-64. The reviewing court will not reverse the trial court's finding of neglect unless it is against the manifest weight of the evidence. *Id.* at 464. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.*

¶ 44    Respondent initially cites this deferential standard of review but, in a footnote, asks this court to consider reviewing this matter *de novo* because in *In re D.D.*, 2022 IL App (1st) 220410, ¶ 69, this court questioned whether it owed the same deference to a trial court that evaluated a witness's testimony over Zoom. We reject respondent's request for *de novo* review. The *D.D.* majority ultimately applied the manifest weight standard (*id.* ¶ 109), and respondent cites no case where the appellate court reviewed a virtual proceeding *de novo*. See *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 147 (footnote lacking argument and authority failed to comply with Illinois Supreme Court Rule 341(h)(7) (eff. Nov. 1, 2017)). Furthermore, *de novo* review of a purely evidentiary finding would subvert the role of the trial court as factfinder and this court as a court of review. See *People v. Bradford*, 2016 IL 118674, ¶ 12 (trier of fact has the responsibility to weigh the evidence, draw reasonable inferences, and judge witness credibility; reviewing court will not substitute its judgment for that of the trial court on these matters). That said, the result would be the same under any standard because the State's uncontradicted evidence established that J.T. was neglected.

¶ 45    The trial court specifically found that J.T. was neglected pursuant to section 2-3(1)(a) of the Act (705 ILCS 405/2-3(1)(a) (West 2018)), which provides that any minor under the age of 18 who has not received the proper care necessary for the minor's well-being, "including adequate *** shelter," has been neglected. The written order's factual basis provided that, "based upon the

credible testimony of the [State's] witness, minor was eight[ ]years[ ]old and not receiving necessary care, specifically adequate shelter; mother was non-custodial." The court further explained in its oral ruling that the adjudication finding focused on J.T., not respondent, who was not obtaining adequate shelter for J.T. but, rather, merely left him with the host family in the temporary housing placement.

¶ 46    These findings were well supported by the uncontradicted testimony of DCFS investigator Madkins, who reviewed the notes of the mandated worker and learned that respondent placed J.T. with a Safe Families host following the hotline call. Madkins offered respondent services for finding a shelter and employment after he said he was unhoused and unemployed. Madkins also explained to respondent that he needed to design a stable care plan because Safe Families was only meant to be a temporary placement for J.T. But over the following weeks and months, J.T. was left in the Safe Families placement because respondent failed to make any progress toward any stable care plan. Respondent claimed that he could go back to the shelter after a 30-day hold was lifted but then said he went to reside with a friend and claimed there was no space for J.T. Then respondent said he would try to find placement with the father of J.T.'s sibling. Thereafter, respondent said he wanted to explore legal guardianship, but he failed to obtain any of the vital records needed for the short-term legal guardianship program, even after Madkins extended the investigation to give him more time to do so. This evidence established that J.T. was not provided with adequate shelter.

¶ 47    Respondent acknowledges that a finding of neglect may be predicated on inadequate shelter or a "lockout" but nevertheless argues that this case is different because the allegation here was based on "a single night sleeping in a hospital," a direct consequence of J.T.'s family's

poverty. But respondent's argument is predicated on the incorrect premise that the finding of neglect was solely based on the allegation in the hotline call. Respondent's argument overlooks Madkins's uncontradicted testimony that, in the weeks and months following the hotline call, respondent failed to create a stable care plan for J.T., which resulted in J.T. being left in the Safe Families placement, which was meant to be only temporary.

¶ 48    Respondent raises four specific arguments relating to the adjudication proceedings. However, for the reasons discussed below, each one lacks merit.

¶ 49                                    1. The Hotline Call

¶ 50    First, respondent argues that the trial court erred in finding that J.T. was neglected where it heard "no admissible evidence that J.T. spent even one night with inadequate shelter, and he was prejudiced because the finding of neglect was based on that allegation. Respondent notes that Madkins reviewed only the report of the mandated worker and had no personal knowledge of the allegations in the hotline report. But respondent's argument is mistaken because (1) the record indicates that the State admitted evidence of the hotline call for the nonhearsay purpose of explaining Madkins's course of conduct—specifically, why she met with respondent to discuss what led to the allegation and how he would resolve it and (2) the finding of neglect was based on respondent's failure to create a stable care plan for J.T. following the hotline call, not the allegation in the hotline call itself.

¶ 51    Initially, respondent asks this court to review this claim under the plain-error test because his trial counsel failed to object below and the alleged error affected his substantial rights as a parent. Under the plain-error test, respondent must show that (1) a clear or obvious error occurred and (2) he was prejudiced because the evidence was closely balanced or the error deprived him of

a fair proceeding. *People v. Sebby*, 2017 IL 119445, ¶ 48. Respondent alternatively argues that the alleged error "was far from harmless." Although "plain-error analysis normally requires the same kind of inquiry as does harmless-error review," the two standards are not interchangeable. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). Significantly, plain-error review applies when a party fails to make a timely objection and that party bears the burden of persuasion on appeal. *Id.* (explaining the difference between plain error and harmless error review). Because respondent did not bring this issue to the trial court's attention, plain-error review is appropriate, and we do not engage in harmless-error review.

¶ 52    In any event, no error occurred because, examining the record in context, the hotline call was apparently admitted only to explain Madkins's subsequent course of conduct. The rules of evidence applicable to civil proceedings apply to adjudication hearings. 705 ILCS 405/2-18(1) (West 2018). Under the Illinois Rules of Evidence, hearsay is defined as a statement, other than one made by the declarant while testifying, offered into evidence to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is generally inadmissible unless a specific exception applies because there is no opportunity to cross-examine the declarant. *In re J.B.*, 346 Ill. App. 3d 77, 81 (2004). However, an out-of-court statement from a nontestifying witness that is not introduced to prove the truth of the matter asserted does not constitute hearsay. *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 88. Statements offered only to show their effect on a listener or to explain the listener's subsequent course of conduct are not considered hearsay. *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 76. Accordingly, while information received by DCFS through a hotline call may not be sufficient to prove the truth of the allegations, it

nevertheless "may be admitted to show why an investigation began." *In re G.V.*, 2018 IL App (3d) 180272, ¶ 29.

¶ 53　The trial court's decision to admit evidence is reviewed for an abuse of discretion, but the preliminary issue of whether a statement is hearsay is reviewed *de novo* when the determination does not involve factfinding. *People v. Steele*, 2014 IL App (1st) 121452, ¶ 34.

¶ 54　While there was no objection in this case and so the State was not asked to explain its legal basis for admitting the challenged testimony, the context of the proceedings demonstrates that the State offered Madkins's testimony about the hotline call for the nonhearsay purpose of showing her course of conduct. Madkins explained that she was not the mandated worker and so she reviewed that worker's notes before meeting respondent. Madkins's review of the report explained why she specifically spoke with respondent about his care plan for J.T. at the initial meeting, why they discussed his employment and housing history, why he was offered resources for seeking employment and housing, and why Madkins would later follow up with him on his progress in creating a stable care plan for J.T. Accordingly, Madkins's testimony about the mandated worker's report was offered to explain Madkins's subsequent conduct, not to prove the underlying allegations, and there was no error in its admission.

¶ 55　Respondent nevertheless argues that he was prejudiced because the State could not meet its burden to establish that J.T. was neglected without any properly admitted evidence of the allegation in the hotline call. However, as discussed above, the evidence at adjudication—and not the hotline call itself—established that J.T. was without adequate shelter because respondent failed to create a stable safety plan in the weeks and months following the hotline call. Respondent's argument ignores the nonhearsay purpose of admitting the hotline call and fails to explain how he

was prejudiced in light of the remaining evidence admitted at trial. Therefore, we reject respondent's hearsay argument.

¶ 56                                    2. Inadequate Shelter

¶ 57    Second, respondent argues that, even if the allegation in the hotline call was properly admitted under the hearsay rule, it was still insufficient to support a finding of neglect because "[e]vidence that a child sleeps in a hospital lobby for one night is not sufficient proof that that child was subjected to illegally-inadequate shelter." This claim is essentially a continuation of his argument that the only evidence of neglect was the hotline call, but that argument is misplaced. As discussed above, the evidence in this case established that J.T. was without adequate shelter in the weeks and months following the hotline call because respondent failed to create a stable care plan for him. Since respondent's argument improperly focuses on the hotline call rather than the remaining evidence admitted at the adjudication hearing, he fails to explain how the trial court's finding of neglect was manifestly erroneous.

¶ 58    Initially, we agree with respondent's argument that the evidence did not specifically support the circuit court's oral pronouncement that J.T. was sleeping on the floor and not getting adequate food and clothing. It is possible that J.T. was sleeping on a chair or sofa in the hospital lobby and was adequately fed and clothed despite his homelessness. Nevertheless, this discrepancy does not render the trial court's finding that J.T. was neglected due to inadequate shelter against the manifest weight of the evidence. Respondent's underlying argument—that the sole basis for the finding of neglect was the allegation that J.T. slept in a hospital lobby for one night—is refuted by the record. Respondent argues that the court did not specify any other time that J.T. had inadequate shelter and that inadequate shelter was the only basis for neglect specified in the court's

written order. But this argument ignores the substantive evidence and argument presented to the court at the adjudication hearing and motion to reconsider and takes the court's words entirely out of context. See *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986) (reviewing court should examine trial court's words in the context of the entire ruling).

¶ 59 While the circuit court stated that J.T. was dropped off and "deserted" at "another shelter," in the context of the evidence presented at trial and the arguments raised in the motion to reconsider, the court was apparently referring to the Safe Families placement as the "shelter" where J.T. resided since the beginning of the investigation. Notably, the public guardian argued that respondent "abandoned" J.T. at the Safe Families placement, and the court apparently agreed with that assessment of the evidence in finding that J.T. was "deserted."

¶ 60 Respondent tacitly acknowledges that the finding of neglect was not solely based on the hotline allegation in his next argument, noting that the evidence at trial included that he could not obtain J.T.'s birth certificate. But while respondent dismisses that evidence as merely a consequence of poverty, without citation, he ignores that the practical effect of his failure to obtain J.T.'s vital documents meant that DCFS could not begin exploring a legal guardianship program, so J.T. was left to reside in a temporary placement without a stable care plan. Accordingly, respondent's argument that the allegation in the hotline call was insufficient to establish neglect lacks merit because the additional evidence at trial established that J.T. was neglected due to inadequate shelter.

¶ 61                              3. Basis of the Neglect Finding

¶ 62 Third, respondent argues that the trial court erred by focusing on whether J.T. was neglected "in the absence of his family context" because the allegations were a direct result of

poverty. In making this argument, respondent contends that a parent's conduct is relevant to whether a child was neglected, a poor parent's conduct must be examined in the context of his or her poverty, and a finding of neglect may not be based solely on the family's poverty or its direct consequences. To support this argument, respondent cites *Arthur H.*, 212 Ill. 2d 441, asserting that it requires that a child's neglected condition be caused by a parent. According to respondent, other pronouncements by the court in *In re A.P.*, 2012 IL 113875, and *In re Z.L.*, 2021 IL 126931, which appear to focus on the status of the minor, would be absurd without the "cause" requirement. Respondent also asserts that "cause" is context-specific and should be read alongside sections 2-3(1)(e)(12) and 2-27(1) of the Act (705 ILCS 405/2-3(1)(e)(12), 2-27(1) (West 2018)), which consider economic hardship or financial circumstances.

¶ 63 Initially, respondent's citation of sections 2-3(1)(e)(12) and 2-27(1) of the Act is misplaced because they do not relate to the allegation in this case. The trial court found that J.T. was neglected pursuant to section 2-3(1)(a) of the Act (*id.* 2-3(1)(a)). As noted at the hearing on the motion to reconsider, the portions of the Act upon which respondent's argument relies are section 2-3(1)(e)(12), which relates to allegations under a different theory of neglect, and section 2-27(1), which relates to disposition findings. Neither section is relevant to the allegation that J.T. was neglected due to inadequate shelter. Furthermore, the supreme court's most recent pronouncement on the issue is that the focus of the adjudication proceeding is whether the child is neglected, not whether the parents are neglectful. *Z.L.*, 2021 IL 126931, ¶ 59; see *In re R.G.*, 2012 IL App (1st) 120193, ¶ 35 (noting that it is of no particular consequence which parent committed the alleged abuse of neglect at an adjudication hearing).

¶ 64    In any event, respondent's argument is misplaced because the finding of neglect was based on the failure to create a stable care plan for J.T. Madkins testified that respondent's plan was simply to return to the shelter after the 30-day hold was lifted and he was offered resources to help, specifically noting that he was offered bus passes. Respondent points to no evidence in the record indicating that poverty prevented him from returning to the shelter. And DCFS extended the investigation so that respondent could have an opportunity to obtain the birth certificate needed to start the process of exploring legal guardianship. But after about 90 days, respondent still had not created a stable care plan for J.T., who remained in what was meant to be a temporary placement. Accordingly, the finding of neglect was premised on respondent's failure to create a stable care plan (and also the mother's inability to care for the minor), not simply their financial circumstances. Therefore, respondent's argument is misplaced and is rejected.

¶ 65                             4. The Stay of the Adjudication Judgment

¶ 66    Fourth, respondent argues that the trial court improperly considered J.T.'s best interests in staying the adjudication judgment and ultimately changing its adjudication finding because the only issue at adjudication was whether J.T. was neglected and where, "despite recognizing that J.T. had not been neglected, [the court] had no intention of letting J.T. return home to his father." But the trial court properly exercised its discretion in staying the proceedings because the public guardian and the State moved to reconsider, so the court properly preserved the status quo until the court decided the motion.

¶ 67    The paramount consideration in proceedings under the Act is the best interests of the child. *Z.L.*, 2021 IL 126931, ¶ 58. A stay is an injunctive tool that a court may use to control its docket, preserve the status quo, and provide for orderly consideration of the issues before it. *In re M.M.*,

2023 IL App (2d) 220259, ¶ 32. The decision to grant or deny a stay is generally a matter within the court's discretion. *Id.* ¶¶ 31-32 ("it was well within the trial court's power to extend its stay on the removal of [the child] until the issues raised by [the foster mother's] and [mother's] motions were resolved"). Notably, the record does not indicate whether respondent attempted to appeal the stay before the court ruled on the motion to reconsider. See generally *Marzouki v. Najar-Marzouki*, 2014 IL App (1st) 132841, ¶ 8 (noting that a stay is an injunction order immediately appealable under Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010)).

¶ 68    The purpose of a motion to reconsider is to bring to the trial court's attention a change in the law, an error in the trial court's previous application of existing law, or newly discovered evidence that was not available at the time of the prior hearing or decision. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36.

¶ 69    The trial court properly exercised its discretion in staying the proceedings until the motion to reconsider was decided because its original adjudication hearing findings were based on an error in its application of existing law. As noted above, the issue at adjudication is whether the child is neglected because adverse conditions exist, not whether the parent caused the neglect. See *Arthur H.*, 212 Ill. 2d at 465-66. After hearing the evidence at adjudication, the court nevertheless found that "[p]overty doesn't equal neglect. The single father. He had just lost his job. I don't find [neglect due to lack of necessary care] or [neglect due to an injurious environment]. Case dismissed. Mother was noncustodial." This decision improperly focused on respondent's circumstances but left unresolved whether J.T. was neglected. Following argument on the motion to reconsider, the court granted the motion, properly noting that it "should have focused on the minor, not the father."

¶ 70   Finally, even assuming the trial court incorrectly employed the best interests standard, its decision to reconsider was correct and is affirmed. See *People v. Lee*, 2016 IL App (2d) 150359, ¶ 14 (appellate court reviews the trial court's judgment, not its reasoning, and can affirm on any basis supported by the record). Since the trial court's original adjudication findings improperly focused on respondent's conduct rather than whether J.T. was neglected for the reasons discussed above, the trial court's decision to stay the proceedings until it resolved the motion to reconsider was proper, even if it employed an incorrect standard in reaching that correct conclusion.

¶ 71                    B. Finding That Respondent Was Unable to Care for J.T.

¶ 72   Respondent next argues that the trial court violated his right to have his "acts or omissions" considered at the dispositional hearing. Respondent specifically contends that the hotline call was a consequence of housing instability and that, rather than help him with housing, DCFS required him to complete services that were irrelevant to the allegation. We disagree. The trial court's finding that respondent was unable to care for J.T. was based on uncontradicted evidence that respondent was noncompliant with recommended services that were reasonably related to the underlying case, and respondent makes no argument that the court's findings were manifestly erroneous.

¶ 73   The purpose of a disposition hearing is for the court to determine whether it was in the best interest of the minor to be made a ward of the court. *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006). The court may do so if it determines that (1) the parents are unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor and (2) the health, safety, and best interests of the minor will be jeopardized if the minor remains in the custody of the parent. 705 ILCS 405/2-27(1) (West 2018).

¶ 74    At the dispositional hearing, the State must establish that a parent is unable to care for the minor by a preponderance of the evidence. *In re Daniel G.*, 2021 IL App (1st) 210640, ¶ 58. A reviewing court will reverse the juvenile court's determination following a disposition hearing "only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *Kamesha J.*, 364 Ill. App. 3d at 795.

¶ 75    According to the integrated assessment admitted into evidence at the disposition hearing, respondent and J.T. had unstable housing for about three years before the hotline call, and respondent "was reportedly 'kicked out' of previous shelters after he engaged in physical altercations with other shelter clients," which led to the case coming to the attention of DCFS. While respondent denied any domestic violence, the mother reported that he "would hit her while being pregnant with their son." The mother further reported that respondent was "aggressive" and "the relationship was abusive the entire time." The mother called the police on respondent once because he had a gun in the home. Respondent had multiple convictions, including a firearm offense. Respondent also reported feelings of depression and anxiety, and he admitted using marijuana. The assessor found that respondent "has not shown his ability to be able to provide and understand the necessary nurture, social and emotional needs of his child" and recommended that he participate in substance abuse assessment/treatment, individual therapy, parenting education, family therapy with J.T., and random drug tests.

¶ 76    Tonajah Hooks, the family caseworker, offered uncontradicted testimony that, since she was assigned to the case in December 2022, respondent had not engaged in services, even though she contacted him and offered several times for him to come to the agency. She could only

sporadically reach respondent via telephone. He never came to the agency, did not participate in random drug tests, stopped engaging in individual therapy, and had not signed consents for other services. His whereabouts were unknown until a diligent search revealed that he was incarcerated. Hooks further testified that, prior to her assignment, respondent's visitation with J.T. was deemed clinically inappropriate because J.T. showed signs of regression after visiting with respondent and asked that visits be scheduled virtually only. Respondent, however, did not attend the virtual visits. Hooks testified that J.T. was discharged from individual therapy, doing very well in school, and was not in need of any other services. He had remained with the same family since the case came into care, the placement was safe and appropriate, and J.T. said he wanted to be adopted by his foster parents.

¶ 77 Based on this evidence, the trial court properly found that reasonable efforts had been made but were unsuccessful and respondent was "unable." Specifically, respondent began engaging in services in 2019 but stopped in 2020 and still had "these services that are outstanding." Meanwhile, J.T. was "in a stable placement." Accordingly, the court made J.T. a ward of the court and entered a written order to that effect. Because the court's decision was supported by evidence that respondent stopped engaging in services, he fails to show that the finding that he was "unable" was manifestly erroneous. See *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶ 90 ("Based on the caseworker's testimony in this case, the court could reasonably find that it was in the children's best interests that the respondents complete recommended services before regaining custody of the children.").

¶ 78 Respondent makes no argument that he made any progress toward completing any recommended services or engaged in visitation, and therefore he forfeits any such claim. Ill. S. Ct.

R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Such forfeiture essentially concedes that the findings at the disposition hearing were not manifestly erroneous.

¶ 79    Nevertheless, respondent now argues that the only issue in this case was housing, and DCFS never provided him with resources to address housing; instead, DCFS required him to complete services for substance abuse, mental health, and parenting skills. Initially, as respondent recognizes, services may be recommended to remedy the condition "that gave rise *or which could give rise* to any finding of *** neglect." (Emphasis added.) 325 ILCS 5/8.2 (West 2018). It would defeat the purpose of the statute for DCFS to ignore information that was learned during the integrated assessment and that could give rise to future instances of abuse or neglect simply because a parent considers it unrelated to the hotline call. See *People v. Phelps*, 211 Ill. 2d 1, 15 (2004) (the primary objective in interpreting a statute is to give effect to the intent of the legislature); see generally *In re Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 22 (discussing cases applying anticipatory neglect doctrine, under which courts will not wait for a child to be actually harmed before acting).

¶ 80    The integrated assessment recommended services reasonably related to the hotline call. Specifically, as noted above, respondent was reportedly kicked out of the shelter for allegedly starting an altercation with another client, which could have been addressed through some of these services like individual therapy. Furthermore, even before DCFS took protective custody, respondent indicated that he could return to the shelter after the 30-day hold elapsed, yet there is no indication he attempted to do so. Given his documented lack of participation in any other

recommended services as discussed above, respondent can only speculate that he would have even worked with a housing advocate if one was offered.

¶ 81 Respondent also argues that the disposition hearing "was not conducted in a timely manner" and amounted to a "foregone conclusion" where "the family's need for stable housing went unaddressed" during the pendency of the case. Respondent's argument again ignores that there was no indication in the record that he could not have returned to the shelter but instead chose to live with a friend in a setting that was too small to be safe for J.T. Moreover, Madkins testified that respondent was given resources, specifically including bus passes to help him find a job. Also, the common law record indicates that respondent agreed to waive both the adjudicatory hearing time limit and the requirement to hold the disposition hearing within 30 days of the adjudication hearing. While respondent failed to include transcripts from most of the pre-adjudication status hearings, he points to nothing in the record on appeal to show that he ever complained about needing additional services, let alone a housing advocate, until the disposition hearing.

¶ 82 Because respondent fails to show that the trial court's finding at the disposition hearing that he was unable to care for J.T. was manifestly erroneous, this court rejects his arguments and affirms the trial court's disposition hearing decision.

¶ 83                                III. CONCLUSION

¶ 84 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 85 Affirmed.

*In re J.T.*, 2024 IL App (1st) 232041

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-JA-828; the Hon. Shannon O'Malley, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Alex Stein, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), for other appellee. |