NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250110-U

NO. 4-25-0110

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 15, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
|     Petitioner-Appellee, | ) | No. 24JA182 |
|     v. | ) | |
| Jaquaileon S., | ) | Honorable |
|     Respondent-Appellant). | ) | David A. Brown, |
| | ) | Judge Presiding. |

---

JUSTICE DeARMOND delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment, finding no issue of arguable merit could be raised on appeal.

¶ 2    In October 2024, the State filed a shelter care petition, alleging T.R. (born in August 2011), the minor child of respondent father, Jaquaileon S., was neglected because her environment was injurious to her welfare. In January 2025, the trial court found respondent unfit, made T.R. a ward of the court, and placed T.R.'s custody with the Illinois Department of Children and Family Services (DCFS). Respondent appealed.

¶ 3    In March 2025, appellate counsel moved to withdraw as counsel and filed an accompanying memorandum, asserting no arguably meritorious issue could be raised on appeal. Respondent was notified in writing of his right to respond and has not done so. For the following

reasons, we grant the motion to withdraw and affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5            On October 1, 2024, the State filed a shelter care petition, asserting T.R. was neglected and should be made a ward of the court. The petition alleged T.R. lived with her mother (Mother), who is not party to this appeal, and T.R.'s environment was injurious to her welfare. The petition alleged DCFS received hotline reports on June 24, 2024, and September 25, 2024, describing Mother's frequent drug consumption. The first DCFS hotline report asserted Mother was smoking methamphetamine and crack cocaine, Mother's boyfriend would engage in drug activities in the house and allow other drug users into the home, and the home was "dirty and flea infested." The second DCFS hotline report stated Mother " 'shoots meth and heroin all day,' " and the reporter most recently saw T.R.'s mother using methamphetamine four days prior. According to the report, Mother and her boyfriend "do drugs together all day and tell the kids to stay outside." T.R.'s siblings would "frequently come to school dirty," and Mother was not coherent when their principal interacted with her. During a school concert, Mother appeared to be under the influence, and her boyfriend passed out. Mother was on probation for theft and possession of methamphetamine following an arrest on August 10, 2024, and her probation officer told DCFS she tested positive for methamphetamine on June 25, 2024, and September 5, 2024. After performing a drug drop on September 19, 2024, Mother "admitted she used methamphetamine over the weekend."

¶ 6            Respondent did not live with Mother. T.R. told DCFS "the last time she stayed at [respondent's] house was on New Years Eve and before that it was a couple of years before." T.R. did not like going to respondent's house "because he smokes weed in front of her a lot." Respondent denied smoking cannabis in front of T.R. and accused Mother of "coaching [T.R.] to

- 2 -

make false allegations."

¶ 7    On October 1, 2024, the trial court granted the shelter care petition and entered a temporary custody order placing T.R.'s custody with DCFS.

¶ 8    On October 23, 2024, respondent filed a motion seeking to vacate the shelter care order, arguing it was in T.R.'s best interest to be placed in his custody. The trial court denied the motion after a hearing on the same day.

¶ 9    On November 6, 2024, respondent filed a second motion to vacate the shelter care order, as well as a motion for summary judgment, arguing he was not responsible for T.R.'s neglect and it was in T.R.'s best interest to be placed in his custody.

¶ 10    On December 11, 2024, the trial court conducted an adjudicatory hearing. Respondent withdrew his motion for summary judgment after the parties stipulated to a finding of neglect with the understanding he did not contribute to T.R.'s neglect. The State entered into evidence the narrative portion of its shelter care petition and proffered that Frank Young of DCFS would testify in support of the petition's contents. The court found T.R. was neglected because her environment was injurious to her welfare.

¶ 11    On January 27, 2025, the Center for Youth and Family Solutions (CYFS) filed a dispositional hearing report. According to the report, respondent resided in a one-bedroom apartment. When respondent participated in an integrated assessment, the assessor suspected him of being under the influence based on his "slowed speech, delayed reactions, and long pauses before responses." This behavior was observed throughout the assessment, along with "random moments of giggling." The assessor indicated concerns regarding the validity of respondent's responses to inquiries about when he last used cannabis. His answers ranged from " 'earlier today' " to " 'earlier this week.' " Family counseling had been recommended, in part due to

respondent's " 'shaky' " relationship with T.R., who often did not want to visit him. Respondent refused to sign information releases to enable DCFS to complete recommended services. Respondent did not want his visits with T.R. to be supervised by staff from CYFS and insisted his mother supervise visits instead. Respondent said he was pursuing reunification, "although [T.R.] has verbalized she does not want to live with him and does not like to participate in frequent visits."

¶ 12    Respondent showed "limited insight and understanding about how [T.R.] is impacted by his behaviors." When asked about an incident during which he allegedly struck T.R. with a belt, respondent "repeatedly referred to his behavior as teasing and said [T.R.] was not physically hurt." The report found respondent's "dismissive attitude *** reflects limited understanding and willingness to apply information to his parenting practices." According to the report, respondent was not attuned to T.R.'s needs, he minimized and denied the need for assistance or treatment, he was "lacking the emotional ability to meet the breadth of his child's needs," and he "prioritizes his needs above those of his child." The report noted respondent's "erratic behavior at times in response to stressors" and reported behaviors that "reflect[ ] poor judgment and self-control." CYFS recommended respondent participate in individual and family counseling, complete a substance abuse assessment, comply with drug screens twice monthly, and complete a parenting class due to his lack of a bond with T.R.

¶ 13    At the dispositional hearing on January 29, 2025, the guardian *ad litem* (GAL) testified T.R. was comfortable with her foster parents, who were her maternal grandparents. T.R.'s younger siblings had also been placed with her maternal grandparents. T.R. had a strong bond with her caregivers. T.R. was "very involved" in school activities, including cheerleading, volleyball, and the scholastic bowl club. T.R. was initially afraid of respondent and did not want

to have visits with him, but visitation had restarted.

¶ 14    The State argued the trial court should find respondent unfit based on the dispositional hearing report's contents, emphasizing respondent appeared to be under the influence during the integrated assessment, he refused to sign releases allowing DCFS to complete certain services, he lacked a bond with T.R., and he "lacks insight as to how his behavior impacts his child."

¶ 15    Respondent argued he did not contribute to T.R.'s neglect, and therefore nothing precluded T.R. from being placed in his care full-time. Respondent requested the trial court find him fit, grant him custody of T.R., and not require him to complete any services. Respondent insisted he "wants to be involved in [T.R.'s] life and father her in every way," and he did not believe court-mandated services were necessary.

¶ 16    The GAL agreed with the State's recommendation and asked the trial court to find respondent unfit. The GAL noted respondent admitted to striking T.R. with a belt during a visit in March 2024, and respondent described the incident as "teasing." During a text message exchange between respondent and T.R. after the incident, respondent accused T.R. of being disrespectful and said that "if she kept it up, she would be feeling tears." The GAL emphasized the lack of a bond between respondent and T.R. and respondent's failure to appreciate the consequences of his actions and how those actions affected T.R. The GAL also voiced concerns over respondent's unwillingness to consent to agency supervision during his visits with T.R. Notably, CYFS "made a critical decision to take over the visitations between [respondent] and [T.R.]" after respondent's mother failed to attend and supervise the most recent visit.

¶ 17    The trial court found it was in T.R.'s best interest to make her a ward of the court and place her in the guardianship of DCFS. The court found respondent unfit, highlighting

respondent's failure to cooperate with DCFS, his visitation issues, and his lack of a bond with T.R. The court acknowledged respondent did not contribute to T.R.'s neglect, but it determined the evidence did not support placing T.R. with him. The court ordered respondent to cooperate with DCFS and any other relevant agencies, engage in individual and family counseling, take a substance abuse assessment, comply with drug drops twice per month, and complete a parenting class.

¶ 18        This appeal followed. In February 2025, respondent's appointed appellate counsel filed a motion for leave to withdraw as counsel and attached a supporting memorandum of law, citing *Anders v. California*, 386 U.S. 738 (1967).

¶ 19                                II. ANALYSIS

¶ 20        On appeal, appellate counsel filed a motion seeking leave to withdraw as counsel. Respondent did not file a response. Appellate counsel argues no arguably meritorious issue can be raised on appeal. After reviewing the record and applicable law, we agree with counsel and grant her motion to withdraw as counsel.

¶ 21        The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) provides the two-step process trial courts follow when determining whether to make a minor a ward of the court. See *In re A.P.*, 2012 IL 113875, ¶ 18; 705 ILCS 405/2-18, 2-22 (West 2022). During the first step, the court conducts an adjudicatory hearing to identify whether the minor is abused, neglected, or dependent. See 705 ILCS 405/2-18(1) (West 2022). If so, the court must then conduct a dispositional hearing to decide whether it is in the best interest of the minor to be made a ward of the court. See 705 ILCS 405/2-22(1) (West 2022). When making its determination, the court will consider "whether the parents *** are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor

or are unwilling to do so," as well as whether "the health, safety and best interest of the minor will be jeopardized if the minor remains in the custody of the minor's parents." 705 ILCS 405/2-27(1) (West 2022).

¶ 22        "The paramount consideration in proceedings under the Act is the best interests of the child." *In re J.T.*, 2024 IL App (1st) 232041, ¶ 67. The trial court is best positioned to determine a child's best interests, and we afford such decisions "broad discretion and great deference." *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). "[A] dispositional order entered in a proceeding under the [Act] is a matter committed to the sound discretion of the court." *In re Beatriz S.*, 267 Ill. App. 3d 496, 500 (1994). We will not reverse a trial court's findings of neglect and parental unfitness unless they are against the manifest weight of the evidence. *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004); *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 23        We agree that no arguably meritorious issue can be raised on appeal. We find no procedural or evidentiary irregularities upon which to base a claim of error. The trial court did not err in finding T.R. was neglected because her environment was injurious to her welfare. The record shows T.R. was living in a dirty, flea-infested house in which Mother and several others frequently used drugs. T.R.'s siblings often went to school dirty. Two different DCFS hotline reports asserted Mother used both heroin and methamphetamine in the house while T.R. and her siblings stayed outside. Mother continued to test positive for methamphetamine while on probation for theft and possession of methamphetamine. The court's neglect finding was not manifestly erroneous because the opposite conclusion was not clearly apparent, and no reasonable argument can be made to the contrary on appeal. See *Ta. T.*, 2021 IL App (4th)

200658, ¶ 48.

¶ 24 Likewise, the trial court did not err in finding respondent unfit. Respondent lacked a strong connection with T.R., and T.R. told DCFS she was afraid of him. T.R. went long stretches of time without visiting respondent, and she frequently reported not wanting to go to his house. When respondent completed the integrated assessment, he exhibited slowed speech, delayed reactions, and random giggling, such that the assessor believed he was under the influence. Respondent showed "limited insight and understanding about how [T.R.] is impacted by his behaviors." Respondent admitted to striking T.R. with a belt and later sending her threatening text messages, calling her disrespectful and warning she would be "feeling tears" if she kept it up. When asked about the incident, respondent minimized his conduct, describing it as "teasing" and insisting T.R. was not physically hurt. Respondent refused to sign releases that would allow DCFS to complete recommended services. Respondent also insisted on having his mother supervise his visits with T.R. rather than CYFS staff, though CYFS assumed supervision responsibilities after respondent's mother failed to attend the most recent visit. Based on the evidence presented, the court's finding of unfitness was not manifestly erroneous, as the opposite conclusion was not clearly apparent. See *Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. We agree with appellate counsel that no arguably meritorious issue can be raised on appeal.

¶ 25                                III. CONCLUSION

¶ 26 For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 27 Affirmed.